939 A.2d 239

DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT v. G.M., DEFENDANT–APPELLANT, AND M.M., DEFENDANT,IN THE MATTER OF THE GUARDIANSHIP OF K.M. AND C.M., MINORS.

Superior Court of New Jersey
Appellate Division

Submitted October 17, 2007—Decided January 23, 2008.

22

24

Before Judges PAYNE, SAPP–PETERSON and MESSANO.

*Yvonne Smith Segars,* Public Defender, attorney for appellant (*Jean M. Hartmann,* Designated Counsel, on the brief).

*Anne Milgram,* Attorney General, attorney for respondent (*Andrea M. Silkowitz,* Assistant Attorney General, of counsel and on the brief).

*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney for minors, K.M. and C.M. *(Cynthia McCulloch,* Assistant Deputy Public Defender, on the brief).

The opinion of this court was delivered by

MESSANO, J.A.D.

In this opinion we address an issue that occurs with apparent frequency at the trial level but has yet to be the subject of a reported opinion. Specifically, what considerations should inform the trial court's decision whether to permit the Division of Youth and Family Services (D.Y.F.S.) to terminate Title Nine proceedings after the filing of an abuse and neglect complaint resulting in the modification of the residential custody of the children at issue? The procedures employed in this case cause us grave concern because the power of the State was utilized, albeit with good intentions, to significantly alter the dynamics of this family, modify the residential setting of two children, and impose a significantly more difficult burden upon the original custodial parent in her attempt to regain the status quo ante. As a result, we reverse the order under review and remand the matter to the trial judge for additional proceedings consistent with this opinion.

I.

Defendant G.M. appeals from the October 26, 2006, Family Part order that 1) awarded her ex-husband M.M., who resides in Florida, physical custody of their two children, K.M. and C.M.; 2) awarded joint legal custody of the children to both parents; 3) awarded G.M. supervised parenting time with the children; and 4) terminated the pending abuse and neglect litigation and provided

that G.M. shall seek "any further relief ... in the existing FM docket."

The record reveals that G.M. and M.M. were divorced in New York on March 10, 2000. Pursuant to the consent judgment of divorce (JOD), they agreed to share joint legal custody of their children—a daughter, K.M., born November 2, 1992, and a son, C.M., born April 25, 1994. The JOD further provided that the children would reside with G.M. and that M.M. would have visitation with them on certain weekends, evenings, and holidays.

G.M. and M.M. modified the custody and visitation provisions of the JOD by stipulation entered on September 26, 2001, in which they agreed to allow the children to relocate to New Jersey with G.M. and to adjust M.M.'s visitation rights depending upon any future relocation required by his employment.[1] M.M. eventually moved to Florida, and pursuant to the stipulation, enjoyed visitation with the children during extended school breaks and during their entire summer recess when they would travel to their father's home.

On the night of March 28, 2006, K.M. contacted her father via text message and told him she was having an argument with her mother. From Florida, M.M. contacted the New Jersey State Police, and Trooper Kelly Bene responded to G.M.'s home at about 10:15 p.m. Upon arrival, Bene heard the children "crying hysterically" and observed they were very upset. The trooper saw that G.M. was intoxicated and observed numerous empty alcohol containers in the house, including a wine box on the floor and a vodka bottle recently placed on top of the garbage can.

K.M. told Bene that during the altercation her mother had grabbed her and pulled her shirt causing her to choke and vomit. Bene observed scratches on K.M.'s arm and vomit on the rug and noticed that K.M. was rubbing her arm during the interview,

---

[1] Although on its face the document does not reveal where the parties resided when they entered into the stipulation, it would appear from its contents that they were both still residents of New York at the time.

apparently attempting to ease some pain. However, both children stated that they did not believe they were in danger.

The State Police contacted D.Y.F.S., and a special response unit worker arrived at the home at approximately 1:30 a.m. to investigate the situation and interview G.M. and the children. As she re-entered the house with the D.Y.F.S. worker, Bene observed K.M. trying to wake G.M. by loudly screaming at her mother. G.M. claimed that she had consumed three to four beers, but was otherwise incoherent and non-responsive. K.M. and C.M. told the worker that G.M. consumed alcohol on a daily basis. The D.Y.F.S. worker determined that a physical altercation had indeed taken place, that G.M. was intoxicated, and that the house was in disarray. She authorized the removal of the two children from the home on an emergent basis, and K.M. and C.M. were temporarily relocated to a neighbor's home, but no criminal charges were filed against G.M.

On the following day, the children were medically examined. K.M. had a slight bruise on her upper arm; C.M. had a case of poison ivy, but showed no signs of physical abuse. D.Y.F.S. also secured a urine sample from G.M. and scheduled her for a substance abuse evaluation at its office the following week.

On March 31, 2006, D.Y.F.S. filed its verified complaint against G.M. and M.M. alleging abuse and neglect and seeking the care, custody, and supervision of the children. G.M. was represented by counsel at the hearing who emphasized that neither of the children had expressed a fear of their mother, that there was not sufficient evidence of imminent risk of harm that would justify removal, and that the children were currently enrolled in school and doing well. While he indicated that G.M. would not object to M.M. having physical custody of K.M. in Florida, he urged the court to immediately return C.M. to his mother.

M.M., who appeared pro se, did not testify, but he did request that the children be permitted to stay with him. He noted that they had regularly visited him in Florida and that they had friends there.

Relying upon the testimony of Trooper Bene and the verified complaint filed by D.Y.F.S.'s intake supervisor, the judge found,

[G.M.] has failed to exercise a minimum degree of care and/or supervision and, in fact, placed the children at risk of harm by virtue of the incident that was reported. This ... too would constitute an act of child abuse and/or possibly neglect by virtue of her alcoholic condition and what occurred.

He entered an order transferring legal custody of the two children to D.Y.F.S. and awarding temporary physical custody to M.M., with the condition that he not remove K.M. and C.M. from New Jersey. The parties were also ordered to arrange for G.M. to have interim supervised visitation with the children.

On the next hearing date, April 6, 2006, no further testimony was taken nor was any documentary evidence introduced. Through counsel, D.Y.F.S. urged the judge to allow the children to return to Florida with M.M. "until [G.M.] can rehabilitate herself." The children's law guardian agreed that they should go to Florida with M.M., particularly since spring school break was imminent and the scheduled visitation would commence soon anyway. However, she noted that C.M. was quite upset at being separated from his mother, and she urged D.Y.F.S. to seek alternative placement with family friends when the boy returned from Florida after spring break.

G.M.'s counsel, however, objected to any transfer of custody. He noted, "[T]his is a child abuse and neglect hearing and while where the child resides is important, I don't believe that this is the right forum to actually transfer ... legal custody of the children." The judge acknowledged counsel's concern, but clearly stated that he was not transferring "legal custody," and he was not "dismissing th[e] matter."

Consistent with the law guardian's recommendation, the judge ruled that the children would go to Florida with M.M. for the upcoming spring break as provided by the existing visitation agreement. He also ordered, however, that K.M. would remain in Florida for the balance of the school year, and that the court would later conduct an *in camera* interview with C.M. before determining whether he should remain in Florida or return to

New Jersey after spring break. Later that day, the judge conducted an *in camera* interview with C.M., on the record, and with a member of the Family Part staff and the child's law guardian present.

Also that same day, the judge entered an order that 1) continued physical custody of the children with M.M.; 2) continued legal custody with D.Y.F.S.; and 3) ordered G.M. to submit to random urine testing, provide information on her paramour to D.Y.F.S., and attend substance abuse evaluation and treatment. A case management conference was scheduled for April 18, 2006. By letter dated the following day, the judge indicated that after interviewing C.M., "and for reasons placed upon the record," both children could be "enrolled in the Florida School System to complete the spring semester." [2]

At the following hearing on April 18, 2006, once again no testimony was taken and no documentary evidence was introduced. G.M. was present with counsel; M.M., who had now retained counsel who was present at the hearing, participated via telephone conference from Florida. Though neither G.M. nor M.M. was ever placed under oath, the judge questioned both of them about the developments since the last hearing.

Through counsel, D.Y.F.S. informed the judge that G.M. had refused to submit to random urine testing on one occasion the previous week and that D.Y.F.S. wished to continue its care and supervision of the children, but that "legal and physical custody [should] be transferred to [M.M.] with legal custody to also remain with [G.M.]."

G.M. contended that she already had given a number of urine samples and did not submit to testing on the one occasion because she was distraught after a confrontation with M.M. on that

---

[2] We have not been supplied with any transcript that sets forth the reasons for this decision if indeed one exists. We note, however, that this possibility was discussed during the proceedings that took place earlier in the day, and was the result requested by M.M.

particular day. The law guardian expressed concern that during her daily phone calls to the children in Florida, G.M. only spoke to her son and not her daughter. The law guardian also advised the judge that the voicemail message on G.M.'s home phone announced to anyone who called, including the children, that M.M. was not allowing her to contact her own children.

Additionally, M.M. contended that G.M. had called his home early on a Saturday morning, and, when told that the children were asleep and would return their mother's call at another time, G.M. threatened his life and that of his new wife. Consequently, the court ordered that telephone contact between G.M. and the children would be permitted, but only if the children initiated the call and only if G.M. changed or removed the offending voicemail message.

On May 23, 2006, the judge held a fact-finding hearing. He again heard the testimony of Trooper Bene and found, by a preponderance of the evidence, that "there was [ ] abuse and/or neglect." Once again, without the introduction of any other evidence, D.Y.F.S., through counsel, stated its position regarding disposition. Counsel noted that G.M. had been referred to Hunterdon Behavioral Health and had entered its substance abuse program. Though no report was apparently produced, counsel asserted that it was the program's recommendation that G.M.'s treatment be "increased to intensive outpatient treatment." Counsel then moved to dismiss the litigation, arguing that the children were currently in a safe environment with M.M., that visitation could be arranged, and that "this case [ ] is going to be opened as ... a matrimonial so that the issue of custody and increased visitation can be addressed through that docket number."

The law guardian opposed D.Y.F.S.'s motion to dismiss the litigation, and, instead, requested the case be left open for a review later in the year so that G.M.'s progress in treatment could be monitored. She recommended that the children remain with M.M. during the summer, with monthly visitation with G.M. either

in Florida or New Jersey; thereafter, she urged the court to consider the children's return to the physical custody of G.M. in New Jersey before the new school year. She noted that the children desired to return to New Jersey, and that D.Y.F.S. needed to "at least make an attempt to reunify this family."

G.M.'s counsel joined in the law guardian's objection. He argued that D.Y.F.S. was "absolutely responsible under the law to seek reunification and return the parties to the status quo." He further noted that G.M. "wants her children back" and that D.Y.F.S. had "an obligation to get [the] information" regarding G.M.'s compliance with her substance abuse counseling, and to continue its monitoring of her efforts. He argued that terminating the proceedings now would present a scenario capable of repetition whenever one parent sought a change in custody. He contended that by lodging a complaint with D.Y.F.S. resulting in the commencement of Title Nine proceedings, the "non-offending parent" would have "a back door way" to gain custody. The judge ordered that G.M. be psychologically evaluated, that she continue substance abuse treatment, that the children remain with M.M. in Florida, and that there be alternate monthly supervised visitation in New Jersey and Florida.[3]

At the next hearing, on July 20, 2006, D.Y.F.S. again moved for termination of the litigation. The law guardian again recommended otherwise, stating that she did not oppose "the transfer of legal and physical custody to [M.M.]" because the children were doing well in Florida and were "very busy this summer participating in a lot of activities." However, she argued the children

---

[3] This aspect of the judge's order engendered significant discussion among the parties as to its practical implementation. G.M. did not have a driver's license, and therefore could not pick up the children from the airport if they flew to New Jersey. M.M. objected to paying for two airline tickets for the children and requested the judge order G.M. to fly to Florida if she wished to exercise her visitation rights. He also objected to G.M. having unsupervised overnight visitation with the children in New Jersey. The judge made no specific rulings on these issues and suggested, instead, that the parties resolve them through counsel.

"prefer[red] to live back here with [their] mother," "very much want[ed] to be reunited with [her]," and considered New Jersey to be their home.

Continuing without any formal testimony, the judge permitted M.M.'s counsel to express support for D.Y.F.S.'s position. She claimed that M.M. had reported to her that G.M. was not staying sober and that she was intoxicated when she called the children in Florida.

G.M. also opposed termination of the litigation and offered a report, though never formally admitted into evidence, indicating that she was "making great strides in her treatment." The judge, once again, did not terminate the litigation, noting concerns over loss of jurisdiction and the prejudice caused to both G.M. and the children by dismissal of the proceedings.

On October 26, 2006, the parties again appeared in court before a different judge due to the prior judge's transfer from the Family Part. No testimony was adduced and no documentary material was ever formally admitted into evidence. The law guardian recommended that, based upon her conversations with the children, it was their wish to remain in Florida and that physical custody should remain with M.M., legal custody transferred to both G.M. and M.M., and the litigation dismissed.

This recommendation directly contradicted D.Y.F.S.'s most recent report to the court, dated October 20, 2006, that indicated both K.M. and C.M. desired to return to New Jersey. The caseworker noted that although the children were adjusting to "living in Florida," they wanted to be "reunified with their mother." It further indicated that neither child could "state a reason why they no longer wanted to live with their father." Counsel for D.Y.F.S. tried to explain the inconsistency between the report and her oral recommendation to the judge by advising that the report, although dated just eight days before the hearing, contained information obtained by the caseworker in September.

Noting that he was completely surprised by the law guardian's oral report, counsel for G.M. objected, stating

[W]e [were] relying on attorney representations in this matter. Had we even had notice about any of this, perhaps we would have had time to have our own investigator to call the children or the father and determine what is going on. This is such a departure from what we have relied on.

. . . .

[W]e don't have any objection obviously to my client being dismissed from the litigation. What has happened through this abuse [and] neglect case is, however, a transfer of custody and this is in contradiction to what has really been indicated to us. My client [ ] speaks with her children and there has been no absolutely no indication to her that the children have expressed this preference to live in Florida. We are all acting under the presumption that they're coming back. . . . I would have appreciated having something that we could rely on before coming to court and having an opportunity to cross examine, perhaps verify, confirm.

The judge determined there was "no reason for [D.Y.F.S.] to continue its involvement in this matter under all these circumstances." He continued,

There is nothing to stop the defendant from pursuing relief through the ordinary Family Court procedure if it appears that the situation should change. So this is not a case where the defendant is left without a remedy. It's simply a case where [D.Y.F.S.] has decided to withdraw from the family's life.

He granted D.Y.F.S.'s request to dismiss the action.

What ensued thereafter, however, reveals that the parties and the judge were unclear as to the consequences of this decision. For example, the judge believed that dismissal of D.Y.F.S.'s complaint effectively vacated all the prior orders that had been entered, including those that required G.M. to continue her substance abuse counseling. M.M.'s counsel immediately objected and claimed that parenting time should be terminated unless G.M. demonstrated continued compliance and sobriety. The judge noted, "[T]he more we get into this, the more the Court is going to have to hold a full hearing on the matter."

G.M.'s counsel then offered the judge a report dated October 25, 2006.[4] He noted this report and all prior reports demonstrated

---

4 This report is not part of the record.

his client's complete compliance with D.Y.F.S.'s requests. While the report was never moved into evidence, the judge noted,

> I would certainly think if this matter comes up again in an FM docket in light of that correspondence, the Court will look at it. If there's not continued treatment, I'm sure [M.M.] will raise that in any opposition to a motion for a transfer of custody and the Court will consider that very seriously. So whether it's ordered here or not, as a practical matter, it's going to be influential in determining the Court's determination on any custody application.
>
> I will say at this point the doctrine of changed circumstances is going to be a little unusual to apply in this situation but the Court will tackle that if and when it should happen, if and when there should be any application. I can't deal with that now. I have nothing before me on it.

The judge entered an order that terminated the litigation, continued joint legal custody of the children with both parents, awarded M.M. physical custody, provided for monthly parenting time for G.M. in New Jersey and Florida, and referred all further relief to "the existing FM docket." [5] This appeal ensued.

## II.

G.M. raises the following points for our consideration:

POINT I

THE LOWER COURT'S FAILURE[ ] TO REUNIFY THE CHILDREN WITH THEIR MOTHER, AT EACH AND EVERY STAGE OF THE PROCEEDINGS, W[AS] REVERSIBLE ERROR. (Not Raised Below)

POINT II

THE [ ] LOWER COURT ERRED IN FINDING ABUSE AND NEGLECT BECAUSE THE STATE FAILED TO PRESENT A PRIMA FACIE CASE. (Not Raised Below)

POINT III

DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HER CONSTITUTIONAL RIGHTS [ ]. (Not Raised Below)

POINT IV

THE LOWER COURT[ ] ERRED WHEN [IT] FAILED TO FOLLOW THE GOVERNING STATUTES AND PROTECT DEFENDANT'S CONSTITUTIONAL RIGHTS. (Not Raised Below)

---

[5] There is not any indication in the record that an FM docket ever existed or that the JOD and consensual stipulation of modification, both entered in New York, were ever the subjects of any post-judgment proceedings in New Jersey.

While we are not persuaded by the arguments raised in the first three points, we are nonetheless convinced that the procedures employed at the trial level 1) were fundamentally unfair and significantly deprived G.M. of the ability to contest the removal of her children from her physical custody; and 2) failed to adequately address whether M.M.'s continued physical custody of the children was in their best interests. We are compelled, therefore, to reverse and remand the matter for further proceedings consistent with this opinion.

We begin by noting our disagreement with G.M.'s second point, the claim that the first trial judge mistakenly concluded that D.Y.F.S. had demonstrated a prima facie case of abuse or neglect. D.Y.F.S. initially sought to remove the children from G.M.'s home on an emergent basis pursuant to *N.J.S.A.* 9:6–8.29(a), which allows such removal without a court order "if the child is in such condition that his continuance in said place or residence or in the care and custody of the parent or guardian presents an imminent danger to the child's life, safety or health." *See also N.J.S.A.* 9:6–8.33(c) (providing that "[i]n cases of emergency, in addition to the removal of one child, any other child residing in the home may also be removed if his immediate removal is necessary to avoid imminent danger to his life or health").

The hearing held on March 31, 2006, fully complied with *N.J.S.A.* 9:6–8.30(a), which provides in pertinent part that after emergency removal, D.Y.F.S. shall "advise the parent or guardian to appear in the appropriate Superior Court, Chancery Division, Family Part within two court days" for a determination of the "sufficiency of cause for such removal." And, contrary to defendant's assertions, the findings made by the judge were amply supported by substantial credible evidence and justified his determination to remove the children from G.M.'s care, custody and control. *In re Guardianship of D.M.H.*, 161 *N.J.* 365, 382, 736 *A.*2d 1261 (1999).

Nor do we quarrel with the judge's decision to grant M.M. temporary physical custody of the children. *N.J.S.A.* 9:6–8.55

specifically provides that "[t]he court may [ ] award custody of the child, during the term of the order of protection to either parent or to an appropriate relative." The practical considerations that faced the judge as first spring break recess, and then summer recess, imminently loomed were significant. Within months, the children were going to be residing with M.M. in Florida anyway because of the terms agreed to by both parents in their modified JOD.

Given these practical concerns, we do not suggest that a different result was necessarily warranted at that time. Certainly, up to this point in the proceedings, we find no reason, either procedurally or substantively, to disturb the factual findings or legal conclusions reached by the judge, and the actions he ordered as a result.

However, we agree with defendant that both procedurally and substantively the second Family Part judge mistakenly exercised his discretion when he terminated these proceedings without ever conducting a formal custody hearing. We draw support for this conclusion from many sources including the well-established jurisprudence governing issues regarding the custody of children, the idiosyncratic facts of this case, and from the general application of notions of fundamental fairness.

The judge undoubtedly had the authority to award M.M. custody of his two children while the order of protection was in effect. *Id.*; *and see N.J.S.A.* 9:6–8.31 (permitting the court to remove the child "to an appropriate place or place him in the custody of a suitable person"). We also conclude that such a change in custody is not a "placement" pursuant to *N.J.S.A.* 9:6–8.54 and did not trigger all the statutory requirements in that respect. However, the decision to modify residential custody needed to be based upon careful consideration of each child's best interests. This never occurred.

Once the children were in Florida for the summer, and future court proceedings were potentially going to fundamentally alter the custodial arrangements to which both parties had previously

agreed, we believe the judge was required to conduct a formal hearing as to whether the children's continued residence with M.M. in Florida was in their individual best interests, and to do so before granting D.Y.F.S.'s request to terminate the proceedings. The issues presented in that context were no different from other disputed custody cases.

The decision to allow the children to reside in Florida with M.M. had an additional corollary effect under the facts of this case that further convinces us the procedures utilized were fundamentally unfair and produced an unjust result. The record reveals that G.M. had limited financial resources. She had trouble paying her rent, was employed on a part-time basis, and, on at least one occasion, simply could not afford to travel to Florida to see her children pursuant to the interim parenting schedule fashioned by the first judge and included in the final order entered. Under these circumstances, G.M.'s rights to see her children were significantly curtailed resulting in a near de facto termination of her parental rights.

We note that it was the actions of the State that set into motion the events culminating in this result. It was the initiation of the Title Nine proceedings in the first instance, coupled with the decision to permit their termination without a full and complete custody hearing, that provided the mechanism for this arbitrary result. We must conclude that the doctrine of fundamental fairness which " 'serves to protect citizens generally against unjust and arbitrary governmental action, and specifically against governmental *procedures* that tend to operate arbitrarily,' " *Doe v. Poritz,* 142 *N.J.* 1, 108, 662 *A.*2d 367 (1995) (quoting *State v. Ramseur,* 106 *N.J.* 123, 377, 524 *A.*2d 188 (1987) (Handler, J., dissenting)), further supports the requirement that a full custody hearing take place before termination of the Title Nine proceedings.

### III.

We first note our deep concern regarding, in particular, the procedures employed during the several hearings that followed

the fact-finding hearing. Those hearings, which culminated with the final proceeding on October 26, 2006, were deficient and denied G.M. the basic due process rights that must accompany any action that contemplates such significant consequences.

While the trial judge may exercise broad discretion in his or her control of the proceedings, as we noted in *Division of Youth and Family Services v. J.Y.*, 352 *N.J.Super.* 245, 264, 800 *A.*2d 132 (App.Div.2002), "the trial judge has the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings."

Our review of the record indicates that with the exception of Trooper Bene's testimony at the initial hearing and subsequent fact-finding hearing, no other witness ever testified during any of the numerous court proceedings in this matter. Despite the fact that the appellate record includes reports that G.M. never had a positive urine screen during the ensuing months after the children were removed, that her substance abuse counselor generally recognized her compliance and, in the end, noted her "great strides" toward rehabilitation, none of these documents were ever introduced into evidence, and we cannot tell from the record whether the judge ever considered them. No expert was ever called by any party on any issue. And, despite G.M.'s objection to the termination of the proceedings, her well-founded claim of surprise at the law guardian's oral recommendation to the judge, and her request to present her own evidence for the court's consideration, the litigation came to a complete and abrupt halt.

Throughout the proceedings, the attorneys "were permitted to make material factual representations that were then accepted by the court in lieu of sworn testimony from witnesses." *Ibid.* A proceeding "conducted with [this level of] informality and general lack of adherence to fundamental evidentiary rules" is inadequate. *Id.* at 268, 800 *A.*2d 132. It does not matter that some of these hearings occurred after the fact-finding hearing of May 23, 2006, because, as we have noted "the dispositional hearing[s] must

observe the same procedural and substantive requirements appli-
cable to the fact-finding hearing." *Id.* at 267, 800 *A.*2d 132; *and
see N.J.S.A.* 9:6-8.46(c) (permitting "only material and relevant
evidence [to] be admitted" at a dispositional hearing and "during
all other stages of a proceeding under [the] act").

In sum, the proceedings that occurred after the fact-finding
hearing were inadequate. As a result, G.M. was denied the ability
to defend the action brought against her and to support her own
claims to regain residential custody of her two children.

## IV.

We wish to clearly indicate the limits of our holding. We do not
agree with G.M.'s implicit suggestion that D.Y.F.S. cannot decide
to terminate Title Nine proceedings because it would permit "an
end run" around the usual way in which custody disputes are
resolved. We can find no statutory bar that prohibits the agency's
decision to terminate the abuse and neglect proceedings, nor is
there a statutory obligation placed upon D.Y.F.S. to continue
supervision of the family and provide services for an indefinite
period of time. *N.J. Div. of Youth and Family Servs. v. R.G.,* 397
*N.J.Super.* 439, 447–48, 937 *A.*2d 1013 (App.Div.2008).

However, we do take note of *N.J.S.A.* 9:6–8.50(e). That section
requires that whenever the court makes a finding of abuse or
neglect, and refers to D.Y.F.S. "any aspect of the matter, includ-
ing anything related to the child and the parent," and "order[s]
[D.Y.F.S. to] provide such services as are deemed appropriate to
the ends of protecting the child and rehabilitating and improving
family life," all of which occurred here, D.Y.F.S. is required to
"report its intent to terminate services ... to the court in writ-
ing."

That same section permits the judge to "suspend any disposi-
tional hearing indefinitely," while D.Y.F.S. "report[s] on the status
of the case ... annually in writing[.]" We discern from these
rather formal requirements that while D.Y.F.S. may be free to
seek the termination of its involvement with the family after

initiating its complaint, the statute intended that consideration of the request must include a rather far-reaching and thorough consideration of the affected children's best interests and whether they are indeed best served by the termination of the litigation. In other words, in this case, before termination was permitted by the court, the judge needed to decide whether 1) the children's best interests were served by their continued residence with the original custodial parent, albeit with D.Y.F.S.'s continued obligation to provide services and to monitor the home life; or 2) whether their best interests were served by ordering a change in residential custody. In this case, no hearing was held to consider that difficult issue and, in light of conflicting informal accounts of the children's own preferences and D.Y.F.S.'s own recommendations, it was a mistaken exercise of discretion for the judge to grant D.Y.F.S.'s request and terminate the proceedings without a full custody hearing.[6]

■ As noted above, we do not conclude that a decision to modify the residential custody of a child as between his or her natural parents implicates the statutory strictures regarding a "placement," a term that is never defined anywhere in Title Nine. *See R.G., supra,* at 448, 937 *A.*2d 1013 (holding a permanency hearing is not required because a change in custody between the natural parents of a child is not a "placement"). Nevertheless, once the abuse and neglect proceedings are initiated, the powers of the court are strictly circumscribed by the statute.

*N.J.S.A.* 9:6–8.51(a) clearly defines and limits the dispositional alternatives available to the judge after making a finding of abuse or neglect. That section provides that after any dispositional hearing,

[T]he court shall enter an order of disposition: (1) suspending judgment in accord with [*N.J.S.A.* 9:6–8.52]; (2) releasing the child to the custody of his parents or guardian in accord with [*N.J.S.A.* 9:6–8.53]; (3) placing the child in accord with [*N.J.S.A.* 9:6–8.54]; (4) making an order of protection in accord with [*N.J.S.A.* 9:6–

---

[6] To the extent our colleagues' opinion in *R.G., supra,* implies otherwise, we must respectfully register our disagreement.

8.55]; (5) placing the respondent on probation in accord with [*N.J.S.A.* 9:6–8.56]; (6) requiring that an individual found to have abused or neglected a child accept therapeutic services, and this order may be carried out in conjunction with any other order of disposition.

Modifying the custodial arrangements between two divorced natural parents does not precisely fit into any one of these permitted dispositions.

The suspension of judgment, pursuant to *N.J.S.A.* 9:6–8.52, allows the court to "define permissible terms and conditions," "relat[ing] to the acts of commission or omission of the parent or guardian" upon which the abuse or neglect finding was based. *Ibid.* A suspended judgment shall last for one year, unless the court determines "exceptional circumstances require[ ] extension [ ] for an additional year." If a parent or guardian fails to comply with the conditions attached to an order of suspension, the "court may revoke the suspension ... and enter any order that might have been made at the time judgment was suspended." *N.J.S.A.* 9:6–8.66. From our review of the record in this case, it is clear that the judges never considered the option of a suspended judgment in this case and none of the relief granted was premised upon that statutorily-authorized disposition.

By its own terms, *N.J.S.A.* 9:6–8.53 only applies to a dispositional order that releases the child to "the custody of his parent or guardian responsible for his care at the time of the filing of the complaint." Such release may be made with appropriate conditions that may last for one year, or, upon a showing of exceptional circumstances, that may be extended for an additional year. *Ibid.* While M.M. shared joint legal custody of the children in this case, we do not discern from the clear language of the statute that it would apply to any situation other than the release of K.M. and C.M. to G.M. with whom they had lived for the majority of their lives on a daily basis. Therefore, the decision to modify the permanent residential custody arrangement was not authorized by this section of the statute.

The "placement" of a child implicates an extensive statutory scheme that provides both the criteria justifying this option and

the mechanism for achieving it. For example, *N.J.S.A.* 9:6–8.54(a) provides that a child may be placed with "a relative or other suitable person ... after a finding that [D.Y.F.S.] has made reasonable efforts to prevent placement or that reasonable efforts to prevent placement were not required [by *N.J.S.A.* 30:4C–11.2]."[7] The court, thereafter, may review the initial placement periodically as required by statute. *N.J.S.A.* 9:6–8.54(b)(1) and (2). Usually, the placement may be followed by a permanency hearing held pursuant to *N.J.S.A.* 9:6–8.24(e), which provides that "[a]ny hearing held before the Family Part may serve as a permanency hearing to provide judicial review and approval of a permanency plan for the child if all the requirements of [*N.J.S.A.* 30:4C–61.2] are met."[8] Any placement may be terminated upon the filing of a petition by "the child's parents or guardian" demonstrating the term of the placement has expired and sufficient grounds exist for the return of the child. *N.J.S.A.* 9:6–8.60.

However, we fail to discern anywhere throughout the extensive legislative scheme that the transfer of custody from one parent to another, particularly under the facts presented here, necessarily implicates these procedural and substantive requirements. M.M. had routinely and repeatedly exercised his parenting time with his children, and the record reveals that the children apparently benefited from the existing visitation schedule in this regard. He was not a stranger to their lives and we see no reason to equate the grant of residential custody to him with a placement as that term is used throughout the statute.

This interpretation of the legislative scheme is further supported by the accompanying New Jersey Administrative Code,

---

[7] That section exempts D.Y.F.S. from the requirement of demonstrating reasonable efforts to avoid a placement in egregious situations involving aggravated conditions of abuse or neglect, or the likelihood of such based upon conduct directed at other children, or the substantial risk of harm to the child making such efforts impractical.

[8] That section provides the procedural and substantive elements for a permanency hearing.

which in relevant part distinguishes between parents and out-of-home placements.[9] *N.J.A.C.* 10:133–1.3. For example, the Code defines various forms of "placement" or "out-of-home placement," none of which includes placement with a parent. Further, the Code distinguishes between relatives and parents of a child, and includes within the definition of "placement" the care of the child by a relative. *Ibid.* Finally, the Code defines "return home" as putting the child with a parent after the circumstances requiring placement have been resolved. *Ibid.* Thus, a placement implies a custodial status that requires the need for continued review by the court precisely because it anticipates a reduction of parental contact with the child on a daily basis, and therefore is not a preferred outcome. That simply would not be the situation under the facts of this case.

Instead we conclude that the transfer of physical custody of a child from one parent to the other natural parent is not a placement as that word is used by the statute.[10] Our conclusion is not altered by the fact that in this case physical custody would rest with an out-of-state parent. In other circumstances, we have permitted an out-of-state relative who was not a natural parent to assume custody of a child pursuant to the statutory scheme. *New Jersey Div. of Youth & Family Servs. v. E.D.*, 233 *N.J.Super.* 401, 406, 558 *A.2d* 1377 (App.Div.) (custody may be granted to out-of-state relatives if it is in the best interests of the child and if New Jersey does not lose jurisdiction over the child), *certif. denied,* 118 *N.J.* 232, 570 *A.2d* 983 (1989). We fail to see why a change in

---

[9] Promulgated under *N.J.S.A.* 30:4C–4(h), the Code is applicable to this case since its scope includes "each client receiving services from the Division." *N.J.A.C.* 10:133–1.2.

[10] The parties have also brought to our attention the unreported decision of our colleagues in *N.J. Div. of Youth & Family Servs. v. K.C.*, No. A–5844–05T4, 2007 *WL* 92356 at *3 (App.Div. Jan. 16, 2007), wherein that panel determined that a transfer of physical custody from one parent to the other natural parent does not constitute a "placement" under the statute. Although not precedential or binding upon us, *R.* 1:36–3, we concur with this conclusion.

custody between the child's natural parents should necessarily trigger all the procedures governing a placement.

Returning to the permitted dispositions provided by *N.J.S.A.* 9:6–8.51(a), it would appear that the change of residential custody after an abuse and neglect finding is permitted by *N.J.S.A.* 9:6–8.55. That section allows the court to "make an order of protection" that sets "forth reasonable conditions of behavior to be observed *for a specified time by a person who is before the court and is a parent or guardian responsible for the child's care or the spouse of the parent or guardian or both.*" (Emphasis added). The court may specifically "award custody of the child, *during the term of the order of protection* to either parent or an appropriate relative." *Ibid.* (Emphasis added).

■ However, in this case, D.Y.F.S. concluded, and the judge apparently agreed, that an order of protection was no longer necessary. This conclusion motivated D.Y.F.S.'s repeated requests to dismiss the litigation. Therefore, once the judge was convinced that K.M. and C.M. no longer needed D.Y.F.S. to exercise its extraordinary statutory powers to insure their safety, the statute did not permit the entry of a dispositional order that terminated the litigation while at the same time significantly altering the custodial arrangements previously agreed to by the parties. Such a result can only be supported by the exercise of the court's inherent parens patriae authority, and that, in turn, can only be justified based upon a complete adjudicative hearing on the issues surrounding residential custody of the children.

In short, if the Title Nine proceedings were no longer extant, the judge lacked the statutory authority to modify the residential custody arrangement for these children. His authority to do so rested solely upon our traditional jurisprudence that permits the court to modify an agreed upon custodial arrangement when faced with a change of circumstances, and when such modification was in the individual child's best interests.

## V.

The touchstone for all custody determinations has always been the "best interests of the child[ren]." *Kinsella v. Kinsella,* 150 *N.J.* 276, 317, 696 *A.*2d 556 (1997) (holding "the primary and overarching consideration is the best interest of the child"); *Hand v. Hand,* 391 *N.J.Super.* 102, 105, 917 *A.*2d 269 (App.Div.2007) (noting "[c]ustody issues are resolved using a best interests analysis that gives weight to the factors set forth in *N.J.S.A.* 9:2–4(c)"); *and see N.J.S.A.* 9:2–4(c) (allowing the court to make "[a]ny other custody arrangement as the court may determine to be in the best interests of the child"). That statute provides for a myriad of factors to be considered and weighed by the judge before making any custodial determination. *Ibid.* We have noted in other contexts that even "a temporary decision to change custody can take on a life of its own, creating a new status quo." *Peregoy v. Peregoy,* 358 *N.J.Super.* 179, 203, 817 *A.*2d 381 (App.Div.2003). And, it is well-established that absent exigent circumstances, changes in custody should not be made without a full plenary hearing. *See, e.g., Entress v. Entress,* 376 *N.J.Super.* 125, 133, 869 *A.*2d 451 (App.Div.2005).

As is clear from the portions of the record quoted above, the decision here was based solely upon representations made by counsel, some of which directly contradicted a report prepared by D.Y.F.S. only eight days before the hearing. Additionally, the decision was made despite the fair claim of complete surprise advanced by G.M.'s counsel, and his request to have an opportunity to rebut the representations D.Y.F.S. and the law guardian made at the hearing. There was no plenary hearing at which evidence supporting the decision to modify the custodial agreement was adduced.

Nor did the judge consider the statutory factors that must guide the custody decision. The decision to award residential custody of the children to M.M., without any evidence or adjudication that such a result was in K.M.'s or C.M.'s best interest, clearly ran afoul of the significant assessment process required before the

modification of any custodial arrangement. Therefore, both procedurally and substantively, the decision to award M.M. residential custody of the two children cannot stand.

The ability to revisit the issue under the matrimonial docket of the Family Part cannot justify a decision lacking authority in the first instance. Moreover, that alternative does not negate the significant prejudice to G.M. resulting from the order under review.

First, though the parties referenced this possibility throughout the many months of these proceedings, the record fails to reveal any docketed "FM" matter even existed. Second, as the judge noted, G.M. would have to initiate such an application and she would now bear not only the costs involved, but also the burden of demonstrating a significant change of circumstances before any further modification of the children's custodial situation would be ordered. *Beck v. Beck,* 86 *N.J.* 480, 486, 432 *A.*2d 63 (1981); *and see Hand, supra,* 391 *N.J.Super.* at 105, 917 *A.*2d 269 (noting "[a] party seeking to modify custody must demonstrate changed circumstances that affect the welfare of the children"). Lastly, and perhaps most importantly, in any such proceeding, G.M. would not be entitled to counsel, nor have the ability to secure experts on her behalf, unless she paid for those services. As we have noted, these proceedings were initiated pursuant to Title Nine, and each order entered by the court was made pursuant to its statutory authority as set forth therein. G.M.'s right to counsel during these proceedings is mandated by *N.J.S.A.* 9:6–8.43, and we conclude that the right to counsel certainly continues during any proceeding in which the residential custody of the children is to be determined prior to termination of the proceedings.

## VI.

Finally, we note the factors that exist in this particular case which must be considered in deciding where the best interests of K.M. and C.M. lie. Since these were not considered below, we do

not address the merits of the issues directly, but do so only to provide guidance to the judge since a remand is necessary.

We note that in her first point, G.M. has argued that the trial judges erred by not "reunify[ing] the children with their mother, at each and every stage of the proceedings." While much of this argument focuses on the alleged inadequacy of D.Y.F.S.'s proofs, an issue we addressed and rejected above, the contention urges an implicit corollary conclusion—that the statutory scheme favors reunification of the children with their parent, in this case with G.M., who had primary residential custody of the children before the complaint was filed.

■ While we recognize reunification is the preferred outcome whenever measured against an out-of-home placement, we do not agree that the statutory scheme necessarily tilts in favor of the restoration of residential custody to the offending parent if the court concludes that a child's best interests are served by granting residential custody to the other non-offending natural parent. In other words, we do not conclude that family reunification necessarily means the children must be returned to the parent who previously exercised residential custody as opposed to awarding custody to the other parent who has shared legal custody and has regularly taken advantage of significant parenting time allotted to him.

As we noted above, we do not view a change in residential custody from one parent to another to be a "placement" for purposes of Title Nine. Therefore, the circumstances in which family reunification is the required, preferable, statutory outcome are inapplicable to the facts at hand. For example, N.J.S.A. 9:6–8.8 requires D.Y.F.S., "prior to placement," "to make reasonable efforts to preserve the family in order to prevent the need for removing the child from his home. After placement, the division shall make reasonable efforts to make it possible for the child to safely return to his home." Under this section, "when determining reasonable efforts ... the child's health and safety shall be of paramount concern." Given the stated intention of the legisla-

tion—"to assure that the lives of innocent children are immediately safeguarded ... and that the legal rights of such children are fully protected"—we conclude that reunification is preferred when measured against an out-of-home placement and the significant diminution of a child's right to the love and comfort of his natural parent that necessarily results from such a placement. But we do not find the legislative intention to be furthered by denying the non-offending natural parent equal footing in any determination of the future residential custody of the children and their best interests.

This is not to say that when the court conducts the required custody hearing before terminating these proceedings it should necessarily accord the non-offending parent any presumption in his favor. We have noted in other contexts that it would be appropriate for a court to consider whether the initial cause for removal of the children from the custodial parent has been sufficiently eliminated. *N.J. Div. of Youth & Family Servs. v. S.S.,* 372 *N.J.Super.* 13, 24, 855 *A.2d* 8 (App.Div.2004), *certif. denied,* 182 *N.J.* 426, 866 *A.2d* 983 (2005); *but see N.J.S.A.* 9:2–4(c) (providing that one factor for the court's consideration is "the fitness of the parents," and further providing that "[a] parent shall not be deemed unfit unless the parent's conduct has a substantial adverse effect on the child").

■ Precisely because D.Y.F.S.'s efforts in support of G.M. are critical, and because the children's best interests may be served by granting G.M. rather than M.M. residential custody, the continued involvement of D.Y.F.S. is necessary while the custody hearing is pending and during the duration of that proceeding. The judge on remand must consider whether G.M.'s initial conduct has been significantly ameliorated, or whether further counseling and monitoring will adequately address the problems presented, such that, on balance, the children should reside with her.

Additionally, the parties in this case entered into a consensual agreement defining their respective custodial roles with respect to their children. *N.J.S.A.* 9:2–4(d) requires the court to "order any

custody arrangement which is agreed to by both parties unless it is contrary to the best interests of the child." While any agreement must yield if it no longer represents what is in the children's best interest, the court is obligated to "place on the record the factors which justify any custody arrangement not agreed to by both parents." *N.J.S.A.* 9:2–4(f). Therefore, on remand, the judge must consider the existence of the modified JOD and clearly indicate why the children's best interests are served by a modification brought about as a result of this litigation.

Lastly, transferring residential custody of the children to M.M. implicates two significant issues that are always present whenever a child is removed from the State of New Jersey-the effect of removal upon the parental rights of the non-custodial spouse and upon the continued jurisdiction of the courts of this State. The judge failed to consider these issues despite the practical result of the final order—K.M. and C.M. were going to reside indefinitely in Florida, their mother was permitted supervised monthly visitation, which, as we noted above, presented major practical limitations to her right to see her children, and the only pending litigation in New Jersey was terminated.

Prior to the final order being entered, the first trial judge obliquely referenced his concern for the potential loss of jurisdiction over the children if residential custody was granted to M.M., and the Title Nine proceedings were terminated. While the court undoubtedly had jurisdiction to enter any custody order pursuant to *N.J.S.A.* 2A:34–65, the court on remand needs to consider the potential loss of jurisdiction that might occur if the children's residential custody is indefinitely modified and they are allowed to reside in Florida with M.M.

Any attempt brought in the future by G.M. to seek further modification might implicate a question of New Jersey's continuing jurisdiction to further modify the custodial order. As we noted in *Griffith v. Tressel*, 394 *N.J.Super.* 128, 140, 925 *A.*2d 702 (App.Div.2007), "When the courts of this state have acquired 'exclusive, continuing jurisdiction,' the second question a court

confronted with a motion to modify that order must consider is whether, during the time between the initial order and the filing of the motion for modification, circumstances have changed so as to divest this state of that jurisdiction." (quoting *N.J.S.A.* 2A:34–66 (providing for the circumstances under which New Jersey is divested of jurisdiction)). "[W]hile this state has either the requisite 'significant connection' or 'substantial evidence,' its exclusive jurisdiction continues." *Griffith, supra,* 394 *N.J.Super.* at 142, 925 *A.*2d 702 (quoting *N.J.S.A.* 2A:34–66a (1)).

We do not know what the contours of any relationship between G.M. and her children may be if they continue to reside with their father in Florida. We have noted, however, that "whether the requisite 'significant connection' [to New Jersey] remains is fact specific," and may turn on whether "the parent who remains in the state in which the custody order was entered exercises parenting time." *Id.* at 146, 925 *A.*2d 702. While we cannot speculate on what might occur, the issues presented are significant, and they remain critical to the trial court's custody decision upon remand.

Lastly, we recognize that in this case, the modification of custody resulting in the children's removal from New Jersey did not arise in the usual context in which such applications are routinely generated. *N.J.S.A.* 9:2–2. Nevertheless, the concerns that removal applications engender apply in this case. As we have noted, "If removal is granted, the nature of the relationship and bond between the parent left behind and the child changes and is at risk." *O'Connor v. O'Connor,* 349 *N.J.Super.* 381, 384, 793 *A.*2d 810 (App.Div.2002). "[R]emoval actions often create, or fortify, walls of animosity between the parents, furthering the negative impact to all concerned." *Id.* at 384–85, 793 *A.*2d 810. On remand, the judge needs to consider the effect removing these children from New Jersey to Florida will have upon this family.

## VII.

Although we have ordered a remand for the purpose of considering whether M.M.'s continued residential custody of K.M. and

C.M. is in the best interests of each child, the other issue raised by G.M. on appeal, specifically that her counsel provided ineffective assistance, is not moot. Because we have affirmed the trial judge's conclusions reached at the fact-finding hearing, G.M. still suffers from the adverse consequences to her caused by these proceedings. Nevertheless, her claim in this regard lacks sufficient merit to warrant any further discussion in this opinion. *R.* 2:11–3(e)(1)(E). We add only the following comments.

G.M. contends that counsel was ineffective, specifically because he did not argue that the transfer of physical custody of the children to M.M. in Florida was prejudicial, did not "aggressively" argue against continued placement with M.M., did not pursue "immediate reunification" at every appearance, advocated for only the return of C.M., and otherwise lacked the requisite experience in similar cases. In order to prevail, G.M. must demonstrate that "(1) counsel's performance [was] objectively deficient . . .; and (2) . . . 'that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *N.J. Div. of Youth and Family Servs. v. B.R.,* 192 *N.J.* 301, 307, 929 *A.*2d 1034 (2007) (quoting *Strickland v. Washington,* 466 *U.S.* 668, 694, 104 *S.Ct.* 2052, 2068, 80 *L.Ed.*2d 674, 697 (1984)).

Contrary to G.M.'s assertions, counsel vigorously argued at every proceeding against any modification in custody and against termination of the proceedings. Counsel did not advocate for the interim return of K.M, but this was consistent with defendant's own wishes. We fail to see any deficiency in the representation G.M. received.

## VIII.

In summary, we hold that modification of the residential custody of a child, from one natural parent to the other, is not a placement under *N.J.S.A.* 9:6–8.54. However, notions of fundamental fairness and the best interests of the child require that the judge conduct a full custody hearing prior to the termination of the Title Nine litigation to determine whether custody should remain as

modified, or whether custody should be returned to the initial custodial parent, subject to conditions and D.Y.F.S.'s continued supervision. Although such a hearing is not required by the specific language of Title Nine, it is implicit in the provision governing termination of the proceedings, *N.J.S.A.* 9:6–8.50(e), and it is required by the overarching statutory concern for the child's best interests.

Absent such a hearing prior to terminating the Title Nine litigation, custody could be effectively modified contrary to the parties' initial expressed intent and without due process. The original custodial parent would then unfairly bear the burden of demonstrating that the new custodial arrangement was not in the child's best interests, yet at the same time be deprived of the representation available to her in the Title Nine litigation and the D.Y.F.S. services available to her if custody was restored with conditions. Since such a hearing was not held in this case prior to the termination of the litigation, we reverse and remand.

Because of the passage of time since the October 10, 2006, order, and because we wish to minimize any further disruption to the lives of these children, the custody hearing we have ordered shall take place on an expedited basis within forty-five days.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.