8 A.3d 236 (2010)
417 N.J. Super. 1
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
J.D., Defendant-Appellant, and
J.B., Defendant-Respondent.
In the Matter of J.B., J.D. and J.D., Minors.
No. A-1163-09T4.
Superior Court of New Jersey, Appellate Division.
Submitted October 6, 2010.
Decided November 22, 2010.
*238 Yvonne Smith Segars, Public Defender, attorney for appellant (Anthony J. Van Zwaren, Designated Counsel, on the brief).
Yvonne Smith Segars, Public Defender, attorney for respondent J.B. (Mark Tabakman, Designated Counsel, on the brief).
Paula T. Dow, Attorney General, attorney for respondent Division of Youth and Family Services (Cynthia J. Schappell, Deputy Attorney General, on the statement in lieu of brief).
Yvonne Smith Segars, Public Defender, Law Guardian, attorney for minors J.B., J.D. and J.D. (Nancy E. Scott, Assistant Deputy Public Defender, on the brief).
Before Judges AXELRAD, LIHOTZ and J.N. HARRIS.
The opinion of the court was delivered by
LIHOTZ, J.A.D.
In this matter, we examine the trial court's application of the Supreme Court's holding in New Jersey Division of Youth & Family Services v. G.M., 198 N.J. 382, 968 A.2d 698 (2009). Defendant J.D. appeals from the Family Part order, which, following a bench trial, denied her request to return her daughter to her physical custody and ordered the child remain in the custody of her father, J.B. For reasons other than those stated by the trial court, we affirm.
J.D. is the mother of three children. Because the children have the same initials as their parents, we have chosen to identify them using fictitious names. The oldest child, John, is now seventeen years old and his brother, James, is now fourteen. The youngest child, Jane, is now eleven and she is the subject of this litigation. J.B. is Jane's father.
On April 11, 2006, following the emergency removal of the children from J.D.'s home by plaintiff, the Division of Youth and Family Services (the Division), N.J.S.A. 9:6-8.29, a Dodd hearing[1] was held. The Division learned J.D. had quit her job, lost her housing, joined a restrictive religious community, and removed the children from school in favor of residing on a religious compound. The Division's caseworker attempted to interview J.D., who did not answer questions and "would go on fits of rambling" and "outbursts." The Division requested temporary custody, alleging J.D. had neglected the children by withdrawing them from school. The court granted the Division's request and ordered all three children be placed with their maternal grandmother. See N.J.S.A. 9:6-8.28(a).
The following day, the Division filed its complaint alleging the children were abused and neglected while in the care of J.D., pursuant to N.J.S.A. 9:6-8.30(b),-8.33(a), and that the family was in need of service, citing N.J.S.A. 30:4C-11 and-12. Specifically, the complaint challenged J.D.'s mental and emotional stability by *239 asserting J.D.'s conduct, such as her refusal to allow the children to have contact outside the religious community, the removal of the children from school for three to four months, and her relinquishment of employment with the resultant loss of housing requiring the children to remain in the home of a member of the religious community, had placed the children at risk and demonstrated J.D.'s need for mental health services. The Division had contacted each of the children's fathers, who were cooperating with its requests for evaluation and services. The complaint referenced "pending litigation" between J.D. and J.B. regarding Jane's custody.
The court continued the provisions of the prior order that granted the Division custody, care and supervision of the children and affirmed their placement with their grandmother. N.J.S.A. 9:6-8.31(b). Although J.D. denied any need for mental health treatment, the court ordered that she participate in a psychological evaluation, attend counseling and enroll in parenting skills classes. J.D. was permitted visitation with the children, supervised by her mother. At J.D.'s insistence, visits occurred at her church.
Approximately two months later, the three children were moved to the home of their aunt. J.D.'s visitation continued to be supervised and was taking place in her mother's home. Reunification efforts stalled because J.D. advised she had not attended counseling, as psychotherapy was incompatible with her religious views. J.D. agreed to commence pastoral counseling, which was accepted with the hope she would later transition to more traditional psychotherapy.
Following Jane's removal from her mother's care, J.B. was permitted supervised visitation. Reports of prior supervised visits between Jane and J.B. that were issued following a domestic violence finding revealed he had appropriate parenting skills. The court supervisor noted J.B. engaged in "stimulating and cheerful" conversations with Jane. The child greeted her father with "genuine happiness and affection," the two would "talk the entire visit, and laugh and giggle during the time."
On the scheduled date for a fact-finding hearing, N.J.S.A. 9:6-8.44, the court accepted the parties' stipulation regarding the course of the continued litigation. The Division requested to dismiss the Title 9 allegations and continue the matter under Title 30, N.J.S.A. 30:4C-12, following J.D.'s acknowledgement that the children could not return home because she had inadequate housing and further, that she needed services to address possible mental health issues and family therapy.
The judge entered an order stating the action was a Title 30 proceeding, and specifically noted he was doing so "without a finding of abuse or neglect." The court ordered J.D. to continue psychotherapy, attend a psychiatric evaluation, obtain housing and employment, and continue supervised visitation in the home of the children's caretaker, their maternal great aunt.
During the proceeding, J.B. requested Jane be placed in his care. He explained Jane had lived with him three days each week when J.D. attended the State correction officer's academy. J.B. noted he, A., his fiancée, and their two girls had a stable home,[2] Jane had a good relationship with her siblings, and the residence provided sufficient space for her to live. Jane's *240 grandmother agreed Jane loved her father and should spend time with him; however, she counseled against splitting up the three children.
In considering J.B.'s request, the judge referenced a domestic violence file in which J.B. had submitted to a psychological evaluation with respect to his ability to parent Jane. The evaluator, Roger T. Barr, Ed.D., had recommended unsupervised visitation. The court declined to place Jane in J.B.'s home and identified the goal of the matter was to reunify the children with their mother. The judge cautioned, however, if J.D. could not provide a safe and stable home for the children, that objective might change. The judge noted J.B. was free to file a request for custody, which "would involve another hearing" and permitted J.B. unsupervised visitation with Jane for six or eight hours each Saturday.
By September 27, 2006, J.D. was progressing well and compliant with all services suggested by the Division, including counseling with Scott R. Schafer, LPC, LMFT. She remained employed and intended to live with her sister, who had adequate space for the children. She requested unsupervised visits, which the judge allowed to be incorporated in the Division's plan for reunification.
J.B. requested overnight visitation with Jane. The court was told J.B. and the children's caretaker communicated well on visitation issues and were able to adjust the schedule based on Jane's activities. The court granted J.B.'s request, ordering one overnight visit every other weekend.
By year's end, J.D.'s progress slowed as her living arrangement with her sister became strained and she resorted to renting a single room in another's home. J.D. admitted she was not steadily employed, but continued to ponder possible employment options after reinstating her cosmetology license.
Based on reports by the children, their therapist requested J.D.'s visits remain supervised. Apparently, during one unsupervised visit, J.D. told the children they were not permitted to eat, as it was the Sabbath. During another, J.D. yelled and screamed, and during a third, J.D. told the children she was going to run away with them. The court ordered all visits be supervised by and in the home of J.D.'s mother or occur at the church.
No change was ordered regarding J.B.'s care of Jane. The court advised J.B. he could file a motion if he desired additional parenting time.
One year following removal, conflict and bickering between J.D. and her children prompted additional evaluations and a request that she attend parenting skills classes. The children's caretaker expressed difficulties in reaching J.D., who had no telephone and did not regularly communicate with the children. The caretaker stated that in the past four months, J.D. missed many visits. All three children expressed discontent with, and a desire not to return to their mother's care; Jane wished to live with her father, while her brothers sought to stay with their great aunt.
J.D. stated it was her desire to delay any attempted reunification until July 1, so as not to "disrupt the children's schooling." J.D. planned to obtain housing and conclude her community college classes by that date.
Jane began displaying regressive behavior and tantrums to the point of needing crisis intervention as a result of J.D.'s absence, adjustment problems in her great aunt's home and difficulties with her older brothers. Jane was taken to JFK Hospital in Stratford on March 19, 2007, where she commenced intensive counseling and was scheduled for a psychiatric evaluation.
*241 On April 30, 2007, the children's caretaker requested their removal. John and James were placed separately with their respective paternal aunts, and Jane was placed with J.B., in accordance with the court's order granting him legal and physical custody. J.D. continued supervised visitation at her mother's home.
During a review hearing held on July 16, 2007, the court was advised that J.D. had obtained employment, located an adequate apartment, and continued psychotherapy with Mr. Schafer. The court continued Jane's custody with J.B., but granted J.D. unsupervised visits including an overnight visit every other weekend with John, James and Jane. The court also entered a self-executing order allowing the Division to supervise the implementation of a plan for the reunification of John and James with their mother.
On September 11, 2007, John and James expressed a desire to return to J.D.'s care, however, Jane wanted to remain with J.B. Based on the recommendation of Mr. Schafer, John and James were returned to J.D.'s home. Jane remained in the custody of J.B. and began to attend counseling with her mother.
On December 10, 2007, the Division requested to end its involvement with the family and dismiss the litigation. John and James remained in J.D.'s care and Jane resided with J.B. J.D. voiced a desire for Jane to return to her custody. The court noted there was a custody dispute regarding Jane "that had been consolidated with" the current action. After further argument advanced on behalf of the parties, consideration of Mr. Schafer's updated report, the caseworker's observations, and the Law Guardian's recital of the children's status, the court ordered "that under all circumstances based on the whole history of this case that the appropriate arrangement ... in the best interest of these children [is] to remain in the current arrangement[s,] with [Jane] remaining in the custody of [J.B.] and [John and James] with mom[.]" Further, the judge stated: "If things change, [J.D.] can make an application under [the] FD [docket number] to regain custody of [Jane] at a future date." J.D. was granted liberal visitation with Jane, so that every two weeks Jane was with her, Friday through Sunday one week and Monday overnight to Tuesday the next. Additionally, J.D. was afforded three consecutive weeks during the summer, alternate holidays and other times as the parties agreed.
The litigation was concluded at that point with the dismissal of the Division's complaint. J.D. did not appeal.[3]
On January 23, 2008, we published our opinion, New Jersey Division of Youth & Family Services v. G.M., 398 N.J.Super. 21, 939 A.2d 239 (App.Div.2008). In G.M., we concluded that when a child is removed from one parent who is charged with abuse or neglect and placed in the custody of the other biological parent who was not the subject of the Title 9 litigation, a trial judge needed "to decide whether 1) the children's best interests were served by their continued residence with the original custodial parent, albeit with [the Division's] continued obligation to provide services and to monitor the home life; or 2) whether their best interests were served by ordering a change in residential custody." Id. at 40, 939 A.2d 239.
The trial judge in G.M. had terminated the abuse and neglect litigation without conducting an evidentiary hearing regarding the children's custody. Ibid. Reversing that decision, we stated:

*242 In this case, no hearing was held to consider that difficult issue and, in light of conflicting informal accounts of the children's own preferences and [the Division's] own recommendations, it was a mistaken exercise of discretion for the judge to grant [the Division's] request and terminate the proceedings without a full custody hearing.
[Ibid.]
In this matter, on March 7, 2008, the judge reopened the litigation for the purposes of conducting a G.M. "best interest custody hearing." The transcript reveals the action was not reopened at J.D.'s request, but on the court's "own motion." The judge reappointed a Law Guardian for Jane, scheduled the parties for mediation and reassigned the matter to a different Family Part judge (the trial judge) to conduct a custody trial.
When the trial judge reviewed the matter, there was some confusion as to how the case had been reopened. The Division advised it had no open file for the family and no interest in an ongoing custody dispute between biological parents. Although a year had passed since Jane was placed in her father's custody, J.D. sought an evidentiary hearing on whether Jane should have been returned to her care. The Law Guardian reaffirmed Jane's steadfast desire to stay with J.B., subject to J.D.'s parenting time.
The trial judge reviewed the March 7, 2008 order, and concluded it required J.D. to advance her evidential basis for modification of Jane's custody. In managing the matter in preparation for trial, he ordered the parents not to discuss the litigation with Jane, incorporated the "Children's Bill of Rights"[4] into his order, provided for discovery, required the exchange of expert reports, and scheduled trial.
The custody trial commenced on January 22, 2009. J.D. testified on her behalf, offered the observations of her friend Michael Morton, who on occasion had accompanied her while picking up Jane from J.B.'s home and the Division's case worker, Martin Dorliae, who last had contact with the family in 2007. Additionally, J.D. presented the expert testimony of David Bogacki, Ph.D.
To support his position, J.B. testified, as did his fiancée, A., and Maureen Wiley, Senior Probation Officer, who supervised the visits between Jane and J.B. in 2006. Additionally, J.B. presented Ronald S. Gruen, Ed.D., his custody expert. Finally, the trial judge conducted an in camera interview of Jane.
J.D. described Jane's room in the home she had obtained in August 2007, her full-time and part-time employment, and her residential family that included John, James and, since 2008, her father. She acknowledged Jane's emotional outbursts had ceased since living with J.B., and no additional hospitalizations were required. J.D. did not view her employment as an impediment to Jane's care, stating Jane enjoyed accompanying her to her employer's hair salon on Saturdays. J.D. described her assistance with Jane's hygiene needs and her instruction on the importance of proper food choices. She professed Jane's relationship with John and James was excellent, although she agreed Jane and her brothers fight at times. J.D. detailed her historic interactions with J.B., reviewing the events that required *243 her to seek domestic violence restraining orders. She also stated why she withdrew the restraints. Finally, J.D. asserted Jane revealed to her a wish to "come home" because she was conflicted about staying with J.B.
Dr. Bogacki discussed his two psychological evaluations of J.D.: the first, performed in the course of the previous litigation on August 22, 2006, and the second, at J.D.'s request on September 30, 2008. Additionally, Dr. Bogacki related his findings and conclusions following a bonding evaluation between Jane and J.D.
Generally, Dr. Bogacki noted J.D. had changed from the time she joined the religious community, which she herself labeled "a bad decision" for the children, and noted she had re-embraced secular society. Dr. Bogacki found no signs of psychopathology and nothing that would disqualify J.D.'s capacity to parent. In observing the mother-daughter interaction, he found a very positive bond and concluded there would be "no harm to the child" if placed in J.D.'s care.
On cross-examination, Dr. Bogacki admitted he had not been informed of certain relevant facts, including the extent or nature of the care J.B. had provided for Jane over her lifetime; J.D. had withdrawn the children from school for three to four months, which prompted the Division's removal of the children; and during the litigation, J.D. had had significant lapses in her contact with the children, who remained outside her care for over eighteen months. Dr. Bogacki also acknowledged his evaluation was limited in that he did not consider Jane's relationship with J.B. and he did "not know [J.B.] at all."
J.D. next called J.B. as her witness. He characterized his communication with J.D. as "hostile" and stated conversations were "short," as he avoided talking to J.D. in favor of "stick[ing] to the court order" and allowing A. to act as an intermediary. J.B. was questioned regarding past incidents of domestic violence, his daily Percocet use for a back injury, smoking habits and a past positive drug test. Addressing some financial difficulties, J.B. explained he recently moved the family to the home of A.'s parents and did not tell J.D.
J.B. also described Jane's relationship with her siblings, with A., A.'s parents, the family's regular activities and his view of his relationship with Jane. J.B. spoke of how he taught Jane softball skills and engaged in other outdoor pursuits. In this regard, he depicted one activity the two enjoyed, assessing the water quality of various local streams, identifying insects and analyzing surrounding soil. J.B. related Jane's positive school performance, cooking activities with A., baking with A.'s mother and games she played with the other three children.
J.B. expressed his concerns for Jane as a result of J.D.'s past conduct. He emphasized J.D. had attempted to exclude him from Jane's life, lamenting "it just really sucks that she doesn't care if I ever saw my child again[.]" He described events he suggested were designed to prevent him from seeing Jane. J.B. complained J.D. falsely reported he hit A. in the head with a frying pan, fabricated a story that he inappropriately "touched" Jane and lied about alleged acts of domestic violence.
J.B. was questioned regarding a recent disagreement when he withheld J.D.'s weekend parenting time after she, unilaterally and without notice, took Jane for medical treatment and "shots," then refused to tell him the nature of the inoculations. J.B. expressed his frustration that J.D. seemed to ignore his role as the custodial parent and disregarded the court ordered visitation schedule.
*244 On April 7, 2009, prior to the commencement of the seventh day of trial, the Supreme Court issued its G.M. opinion. Supra, 198 N.J. 382, 968 A.2d 698. The trial judge paused the proceedings to consider the parties' arguments regarding the impact of the Court's opinion on the ongoing litigation.
The was no consensus on whether the custody hearing should continue, and if so, whether any changes were necessary. The Division voiced its objection, arguing nothing further was required because a dispositional hearing resulting in Jane's placement in J.B.'s custody was held on December 10, 2007. The Law Guardian and J.B.'s counsel agreed. J.D. disagreed and maintained that in December 2007, Jane could have safely returned to her home with John and James thus the order granting custody to J.B. must be vacated. J.D. conceded she and J.B. had relied on the court's prior rulings to conduct a custody trial.
Citing Higgins v. Swiecicki, 315 N.J.Super. 488, 719 A.2d 166 (App.Div.1998), the trial judge applied the "law of the case doctrine," concluding he must continue "operating under orders of another judge" so that "once [the case] starts you operate within that case until it's reversed." The court continued:
[I]t's a discretionary doctrine, but I think it's a good doctrine because there's so many things that could have happened.
....
Everybody here has relied upon [the prior order for a custody hearing.] Both the mother and father have had attorneys provided by the State. The mother's case is in, her expert's been heard by the [c]ourt and paid for. [J.B.'s] expert has apparently been retained, but not presented.
I think it would be grossly unfair to interfere with that scenario. I think the law of the case doctrine applies most strongly here and it's my intention to continue with this hearing under the same basis it's been since the beginning and decide the case on what I original[ly] started....
And to try to go back and fix it would do harm to one party or the other and since everybody has had notice, everybody's presented all the evidence they wanted to present, and the litigation was funded under the principles of the appellate G.M., I think the only fair way to do it is to continue.
J.B.'s testimony resumed, followed by testimony from A. She too related the positive atmosphere in the home with J.B. and the children, talking about Jane's relationship with her, her parents and the children. A. explained how she facilitated communication with J.D. regarding Jane and even maintained Jane's relationship with J.D.'s mother.
A. spoke of Jane's transition from the religious community to their home, stating at first the child was withdrawn and quiet after acclimating to the rigid stoic environment of the religious community, wearing the same outfit and shunning modern conveniences, like television. Soon after her arrival in J.B.'s home, Jane began talking about her experiences during this period and gradually assimilated to the family environment, becoming the positive child she is now.
The final day of trial was May 11, 2009. Wiley related J.B. and Jane's interactions during the 2006 court supervised visits. Dr. Gruen, J.B.'s expert, conveyed the results of J.B.'s psychological evaluation and a bonding evaluation between Jane and J.B.
Dr. Gruen found J.B. was very candid, revealing unfavorable incidents the evaluator *245 may not have discovered. He diagnosed J.B. as experiencing "situational depression" as a result of "financial stressors," but otherwise found he suffered no emotional difficulties or other issues impeding his ability and motivation to parent Jane. Dr. Gruen concluded J.B. was a "committed and responsible parent," who was genuinely interested in Jane's welfare.
With respect to the bonding evaluation, Dr. Gruen observed J.B. and Jane were affectionate toward each other, and they demonstrated comfortable body language and good verbal communication. He opined, Jane's "good grades, good behavior, and positive attitude are testimony to her feelings of security and predictability." Although he had not evaluated the relationship between Jane and J.D., Dr. Gruen stated Jane "would likely suffer emotional harm if removed from her father's care and custody at this time."
The court also interviewed Jane, who spoke of her pets, her siblings and her activities while in each parent's home. Jane stated she is not happy when required to go to the beauty shop on Saturdays because the owner criticizes her weight, her mother works a lot and cannot not spend a lot of time with her. Jane also stated J.D., John and James had recently moved to "granny's basement."
The trial judge's forty-eight page written opinion filed on June 30, 2009, recounted the trial testimony and related the court's factual findings to the factors set forth in N.J.S.A. 9:2-4. In assessing each parent's credibility, the trial judge wrote, "[J.D.'s] testimony struck [him] as being self[-]serving and lacking complete understanding as to the causes of her difficulties and the interrelationships between [Jane], J.B. and herself" yet J.B. "understands his problems better ... and therefore is better able to deal with those issues and [Jane]."
The trial judge found the parties' willingness to communicate "less than optimal" as evinced by J.D. taking Jane for medical care without J.B.'s consent or knowledge and J.B.'s residential move without notice to J.D. The judge ascertained some of the past animosity had abated, as the parents struck a balance by funneling communications through A., who willingly obliged. Both J.D. and J.B. desired the opportunity to provide residential custody of Jane and expressed a willingness to afford the other parent liberal visitation. Two domestic violence restraining orders had been entered: the first was dismissed by J.D. when she entered the corrections academy and needed J.B.'s assistance to care for Jane; and the second was dismissed when J.D. determined it was unnecessary and frustrated her ability to facilitate visitation requests. The court found both parents were fit and each provided a safe home for Jane, but J.B. possessed stronger parenting skills and was more suited to address Jane's emotions. Illustrative of this point, the trial judge highlighted that Jane's exhibited tantrum behaviors disappeared while living with her father.
Also, the court determined Jane enjoyed her family, had a good relationship with each set of siblings and loved her parents. Jane's maturity and intelligence was noted, along with her expressed preference to remain with J.B., a position the court found was not prompted by or pressed upon the child by J.B. or A.
Concluding it was "contrary to [Jane's] best interests to disturb an arrangement that has worked for the child[,]" the court granted joint legal custody to the parents, awarded physical custody of Jane to J.B. and allowed J.D. continued liberal parenting time. The court entered a June 30, *246 2009 order terminating the litigation. J.D.'s appeal ensued.
J.D. maintains the trial judge inappropriately applied the "best interests of the child standard" when determining who should have custody of Jane. She asserts the court misapplied its discretion when following the law of the case doctrine, leading to an incorrect substantive result. Finally, she argues "[h]ad the court applied the standards the Supreme Court applied in G.M., the court would properly have returned custody of the daughter to the mother."
In response, J.B. argues the court correctly exercised its discretion in applying the law of the case doctrine. The Law Guardian agrees and also contends J.D.'s arguments are raised for the first time on appeal. Both J.B. and the Law Guardian advance Jane's best interests are properly served by remaining with J.B.
Several issues are raised in this matter that cause concern. Most glaring is the absence of a jurisdictional basis to reopen the litigation in March 2008. Admittedly, our opinion in G.M. was published one day prior to the expiration of the forty-five days earmarked to appeal the December 10, 2007 order terminating the litigation. The request to challenge the court's determination or consider the impact of G.M., however, rested with J.D., who could have filed an appeal or possibly requested the prior order be vacated in light of perceived deficiencies. See R. 4:50-1. In either event, all parties would have had an opportunity to consider the legal issue and present reasoned legal positions.
We are unaware of any authority mandating a trial court review its prior judgments sua sponte in the event of its view of a change in prior law. "`New legal principles, even when applied retroactively, do not apply to cases already closed.'" Zuccarelli v. Dept. of Envtl. Prot., 326 N.J.Super. 372, 378, 741 A.2d 599 (App.Div.1999) (quoting Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 758, 115 S.Ct. 1745, 1751, 131 L.Ed.2d 820, 830 (1995)), certif. denied, 163 N.J. 394, 749 A.2d 368 (2000). On the contrary, public policy favors repose, particularly when the matter is closed to direct review, that is, trial has concluded, a judgment was rendered, and no party filed an appeal.
We presume from what occurred that the first judge somehow believed our determination in G.M. presented a "departure from existing law," which required retroactive application. We assume this was the judge's justification for reopening this matter as it is well settled that a ruling that "does not involve such a `departure from existing law,'" cannot trigger a question of retroactive application. State v. Knight, 145 N.J. 233, 249-50, 678 A.2d 642 (1996).
In ordering the matter reopened, we conclude the judge erred. We do not agree our decision in G.M. imparted a break from prior jurisprudence warranting retroactive consideration and application to this matter.
G.M., supra, 398 N.J.Super. at 51, 939 A.2d 239, was premised on the dictates of "fundamental fairness and the best interest of the child[.]" Ibid. We concluded the trial court had impinged on the defendant-mother's due process rights by not conducting an evidentiary hearing before permanently modifying the judgment of custody for the children. Id. at 52, 939 A.2d 239. In examining the Division's proper exercise of State authority in temporarily removing the children from their mother and placing them with their biological father in Florida, we articulated our concern, focusing on the court's decision, over the mother's objection, to make that situation *247 permanent without a hearing. Ibid. We determined that procedure "significantly alter[ed] the dynamics of th[e] family" and "impose[d] a significantly more difficult burden upon the original custodial parent in her attempt to regain the status quo ante." Id. at 25, 939 A.2d 239.
Moreover, the proceeding as consummated failed to examine conflict between the children's comments to a Division caseworker that they wished to return to their mother's care, and the Law Guardian proffered unsworn representations of their claimed desire to remain in Florida. Id. at 32, 939 A.2d 239. Further, the mother was surprised by the Law Guardian's change in position, but denied the opportunity to rebut the suggestion. Ibid. We agreed with the mother that the court mistakenly exercised its discretion in granting the Division's unexpected request to terminate the litigation without allowing the mother the opportunity to contest the removal of the children from her physical custody and without requiring the children's father to show his continued physical custody was in the children's best interests. Id. at 35, 939 A.2d 239.
Our conclusions in G.M. reflected the need for procedures compatible with the rigors of due process flowing to any party seeking to be heard prior to the court's modification of his or her substantive rights. The Supreme Court affirmed our "deep concern with the procedures employed during the several hearings ... and in particular, the denial of the mother's basic due process rights at the final proceeding[.]" G.M., supra 198 N.J. at 402, 968 A.2d 698 (internal quotations and citations omitted). The Court also agreed with our assessment of the "inadequacy of the proceeding due to the lack of sworn witnesses, the failure to introduce documentary evidence, the failure to call expert witnesses, and the termination of the proceedings over the mother's well-founded claims of surprise." Ibid. (internal quotations and citations omitted).
Reviewing the matter at hand in this light, we conclude the judge's presumption that some retrospective effect be accorded our ruling in G.M., supra, 398 N.J.Super. at 51, 939 A.2d 239, was error. The March 8, 2009 reopening of the case on the court's motion should not have been entered, making all that followed inconsequential.
We cannot now know whether additional litigation would have ensued had the judge left the choice to challenge the December 10, 2007 order to the parties. Nevertheless, given a second chance, J.D. seized the opportunity to assume the role of movant to show why Jane should reside with her under the strictures of a custody hearing guided by N.J.S.A. 9:2-4(c). Now, relying on the Supreme Court's partial reversal of our decision in G.M., J.D. argues the trial judge erred by failing to return Jane to her home once it was deemed safe. For completeness, we address J.D.'s argument that the trial judge failed to comply with the Court's requirements in G.M., supra, 198 N.J. at 402, 968 A.2d 698.
In its review, the Supreme Court reversed our instruction mandating a custody hearing be held prior to closing the protective services litigation to discern the best interests of the children. Ibid. Instead, the Court held that what was required was "a dispositional hearing," pursuant to N.J.S.A. 9:6-8.45. Ibid.
A dispositional hearing is defined as one that determines "what order should be made" in the litigation. N.J.S.A. 9:6-8.45. Once the trial court decides whether the Division has sustained its allegations of abuse and neglect in a fact-finding hearing, a dispositional hearing immediately follows, N.J.S.A. 9:6-8.47(a), and steers the appropriate course of the case. N.J.S.A. 9:6-8.50. As a matter of practice, several *248 dispositional hearings may be held until the Title 9 litigation is concluded.
Notably, the court has multiple alternatives in determining the appropriate disposition. The court may enter a suspended judgment, N.J.S.A. 9:6-8.52; release the child to the custody of the parent or guardian responsible for the child's care at the time of the filing of the complaint, N.J.S.A. 9:6-8.53; place the child with "a relative or other suitable person," N.J.S.A. 9:6-8.54(a); make an order of protection, N.J.S.A. 9:6-8.55; place the offending parent or guardian on probation, N.J.S.A. 9:6-8.56; and/or require the offending person to accept therapeutic services, N.J.S.A. 9:6-8.51(a). In all cases the court "shall state the grounds for any disposition made." N.J.S.A. 9:6-8.51(b). [G.M., supra, 198 N.J. at 399-400, 968 A.2d 698.]
With respect to a hearing prior to terminating the litigation, the Court advised:
[a]t the dispositional hearing, both sides may present ... relevant evidence for the court to determine whether the children may safely be released to the custody of their mother, who was responsible for their care at the time of the filing of the complaint, or whether, consistent with N.J.S.A. 9:6-8.51, some other disposition is appropriate.
[Id. at 402, 968 A.2d 698.]
J.D.'s argument before us maintains that had such a hearing been held on December 10, 2007, the only disposition determination that could have been reached was that Jane could safely be returned to her care. Thus, she asserts the insistence on a best interest custody analysis was error.
Although G.M.'s requirement of a dispositional hearing, rather than a best interest custody determination, has evoked confusion, we do not agree the holding limits the Family Court's role to examine only whether the offending parent has satisfactorily remediated the initial harm that caused the children's removal. Such a position presents too simplistic an approach.
In performing his or her role as parens patriae, a Family Part judge must protect the interests of the children involved in the litigation. Admittedly, a child's safety is the pervasive concern prompting the initiation of a Title 9 action. N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J.Super. 13, 24, 855 A.2d 8 (App.Div. 2004), certif. denied, 182 N.J. 426, 866 A.2d 983 (2005); see also N.J.S.A. 9:6-8.8 (identifying the legislative purpose of Title 9 proceedings as: "The safety of the children served shall be of paramount concern."). Children also have a strong need for stability and permanency in their lives. In re Guardianship of K.H.O., 161 N.J. 337, 352, 736 A.2d 1246 (1999). They can suffer harm from a parent's extended withdrawal of solicitude, nurture and care, as well as a pattern of inattention to the child's needs. This conduct frequently leads to bonded relationships with another who can meet the children's needs and psychological injury is caused if those bonds are broken. In re Guardianship of D.M.H., 161 N.J. 365, 379, 736 A.2d 1261 (1999); N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J.Super. 582, 592, 677 A.2d 1170 (App.Div.1996).
Therefore, dispositional questions become complicated by a parent's delay in achieving the appropriate circumstances allowing safe reunification and the children's need for permanency. In the event of the child's prolonged care by someone, after removal from the offending parent, additional actions may be filed that require a trial court to examine not only the previously articulated goal of reunification between the custodial parent and the child, but also recognize that such an objective *249 might yield to the establishment of a different custodial arrangement, which advances the child's best interests.
For example, a relative who has continuously provided for the child for a period in excess of one year may initiate a proceeding under the Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to-7. In the appropriate matter, the Division might file a petition seeking to terminate parental rights. N.J.S.A. 30:4C-15. Finally, as the Court acknowledged in footnote three of G.M., a non-custodial parent who has assumed full-time care of the child "could always initiate a request for change in custody," which is "`initially by a changed circumstances inquiry and ultimately by a simple best interests analysis.'" Supra, 198 N.J. at 402 n. 3, 968 A.2d 698 (quoting Baures v. Lewis, 167 N.J. 91, 116, 770 A.2d 214 (2001)).
Accordingly, following the Division's removal of a child from an offending parent charged with abuse or neglect, which may be confirmed or rejected following a fact-finding hearing, any dispositional review must consider not only whether the offending parent has abated the harm previously posed, but also must consider whether other parties have asserted the child's best interest demands that custody rest elsewhere. This partially explains the dispositional alternatives within the framework of Title 9, N.J.S.A. 9:6-8.51 to -8.55.
Biological parents or relatives, who assume custody at the Division's request pending services to aid the putative offending parent, cannot merely rely on that placement as a final determination of the child's status. The non-offending parent must initiate an action and demonstrate a basis for a change in any custody order or agreement existing prior to the Division's intervention. Although the proof burdens and interests of a biological parent seeking to make the child's placement permanent may vary from those of the Division in the Title 9 litigation, the same Family Part judge must preside over the third-party actions that are inextricably intertwined with the Division's case.
Based upon our conclusion that the trial court incorrectly reopened this matter, we need not consider the application of the procedure we have now outlined to these facts. We specifically note, however, that this case was not one under Title 9, but one under N.J.S.A. 30:4C-12. Under that provision of Title 30, the Division may apply to the Family Part for an order to allow investigation after learning of a parent who fails to provide "proper protection, maintenance and education" for a child who is in his or her custody. Ibid. "The Court upon such application may proceed to hear the matter in a summary manner and if satisfied that the best interests of the child so require may issue an order as requested." Ibid. If necessary, the Division may obtain an order "placing the child under the care and supervision or custody of the [D]ivision." Ibid. Finally, the statute contemplates the litigation would last no more than six months, ibid., during which the Division must "initiate a search for relatives who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-12.1. Title 30 does not discuss dispositional hearings, as delineated in Title 9.
More important, the posture of this particular litigation was defined by the court and accepted by the parties as a custody determination under N.J.S.A. 9:2-4, where both parents sought custody. Under these circumstances, coupled with the fact that J.D. had not appealed the December 10, 2008 order, we conclude she may not now protest the procedures followed. We also conclude the agreed procedures neither assaulted her rights nor contravened the Supreme *250 Court's holding in G.M., supra, 198 N.J. at 402, 968 A.2d 698.
Were a review of the trial court's determination necessary, we would conclude the findings of fact were amply supported by the evidence presented and that the legal conclusions were soundly supported. New Jersey Div. of Youth & Family Servs. v. H.B., 375 N.J.Super. 148, 172, 866 A.2d 1053 (App.Div.2005). Among the findings supporting the trial judge's conclusion was the credibility of J.B. and the lack of credibility of J.D.; the length of time Jane has been in J.B.'s care, which is now more than three and one-half years; and Jane's unwavering wish to remain with J.B. We reject any argument to the contrary.[5]
We offer these final comments regarding the trial judge's conclusion that he was bound by a prior order entered in the case by another Family Part judge, notwithstanding the potential applicability of Supreme Court precedent. The law of the case doctrine is a principle establishing that an unreversed decision of a question of law or fact made during the course of litigation "settles that question for all subsequent stages of the suit." State v. Hale, 127 N.J.Super. 407, 410, 317 A.2d 731 (App.Div.1974). This concept "bar[s] a second judge on the same level ... from differing with an earlier ruling[.]" Hart v. City of Jersey City, 308 N.J.Super. 487, 497, 706 A.2d 256 (App.Div.1998). It is not meant to prevent a judge from changing a prior decision following "a newly developed basis in fact, law or context upon which to revisit a ruling made in the pre-trial stage." Higgins, supra, 315 N.J.Super. at 492, 719 A.2d 166; see also Gonzalez v. Ideal Tile Importing Co., 371 N.J.Super. 349, 356, 853 A.2d 298 (App.Div.2004) (holding that judges are not obligated "to slavishly follow an erroneous or uncertain interlocutory ruling"), aff'd, 184 N.J. 415, 877 A.2d 1247 (2005), cert. denied, 546 U.S. 1092, 126 S.Ct. 1042, 163 L.Ed.2d 857 (2006). Judicial deference is unwarranted in the event the Appellate Division or the Supreme Court subsequently settles a question of law.
Affirmed.
NOTES
[1] A "Dodd hearing" requires the Family Part to review the Division's emergency removal of children from the home, prior to the initiation of court action by filing a complaint for relief pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to-8.82. The Act was authored by former Senate President Frank J. "Pat" Dodd in 1974.
[2] One of the two children in J.B.'s home is his biological daughter and the other is his fiancée's daughter.
[3] The forty-five day period to file an appeal from the order ended on January 24, 2008.
[4] The "Children's Bill of Rights" is an order, widely used in divorce matters by the Family Part in the Southern vicinages. The order lists twelve principles applicable to custody disputes, including that the children would not be asked to "chose sides" between the parties, not be told about the court proceedings, not be told "bad things" about the other parent and "not to be made to feel guilty for loving both parents."
[5] Any remaining arguments presented by J.D. that otherwise have not been addressed are deemed to lack merit. R. 2:11-3(e)(1)(E).