# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2823-20
     A-2978-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

  Plaintiff-Respondent,

v.

Y.D. and A.D.,

  Defendants-Appellants,

and

C.T.,

  Defendant.

_____

IN THE MATTER OF
K.B. and G.D., minors.

_____

Submitted May 3, 2022 – Decided June 16, 2022

Before Judges DeAlmeida and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0097-20.

Joseph E. Krakora, Public Defender, attorney for appellant Y.D. (Carol L. Widemon, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant A.D. (Arthur David Malkin, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Jessica A. Prentice, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor K.B. (Todd Wilson, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor G.D. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Neha Gogate, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendants Y.D. (Mother) and A.D. (Father) appeal from the February 18, 2021 order of the Family Part finding they abused or neglected their child G.D. within the meaning of N.J.S.A. 9:6-8.21(c).[1] We affirm.

---

[1] We identify the parties by initials to protect confidential information in the record. R. 1:38-3(d)(12).

2                                                                                    A-2823-20

G.D. was five years old at the times relevant to this appeal. K.B., who was twelve-years old, is G.D.'s sibling.[2] The family resides together.

It is undisputed that G.D. suffered second- and third-degree burns covering one-fourth of her body from a hot iron while at home with Mother. Father claims not to have been home when the child was injured. The burns were discovered by school personnel four days after the child was injured. They reported the injuries to plaintiff Division of Child Protection and Permanency (DCPP or Division).

The cause of the burns – whether they were intentionally inflicted by Father or the result of G.D. becoming entangled in the hot iron's electrical cord while sleeping on the floor – was in dispute. In either scenario, the parties agree that Mother was asleep when the child was burned. In addition, defendants deny that their admitted failure to seek medical care for G.D.'s injuries harmed her or placed her at substantial risk of harm.

After a three-day trial, the court issued an oral opinion finding that Father intentionally burned G.D. with the hot iron at least twice. In addition, the court

---

[2] Y.D. is K.B.'s mother. Her father is defendant C.T. who is not participating in this appeal.

concluded defendants' failure to seek medical care for the child exposed her to the substantial risk of infection and a hampered recovery.

The court made the following findings of fact. G.D. was absent from kindergarten on September 12 and 13, 2019, a Thursday and Friday. Mother told school officials G.D. was suffering from a viral infection. When G.D. returned to school on Monday, a teacher noticed she had a bandage on her neck and was wearing two shirts, one of which was stained with blood. When she asked G.D. why she was wearing a bandage, the child stated, "my daddy burned me with an iron."

The teacher brought the child to the school nurse, who observed the bandage to be dirty. When she lifted the bandage, the nurse saw burns on G.D.'s chest that appeared "blistered, red, and bloody." She removed the bandage, cleaned the wounds, and applied burn spray and a new bandage. The nurse determined G.D. needed further medical treatment. When the nurse asked G.D. how she was injured, she said, "my daddy burned me with an iron."

A Division investigator met privately with G.D. at the school. The child told the investigator that she "fell on the floor while playing and fell on the iron." However, when asked how she was burned, G.D. said, "Daddy put a wrap on me." When asked to clarify her statement, G.D. said, "Daddy put an iron on

4

me." G.D. said that her "mother was asleep, and she put cold water on her body." G.D. told the investigator that her "leg was burned too," that K.B. "burned my leg," and that "everyone burns my legs." G.D. disclosed that when she is in trouble, she "get beatings," that "the iron beats" her, and that K.B. was there and crying when the iron beats her.

The investigator also met with K.B., who admitted she was asleep at the time of the incident. She stated that Father was not home when G.D. was burned and arrived shortly afterward. A DCPP record notes that K.B. previously said that her Father woke her up after the incident to ask for assistance treating G.D.'s wounds, suggesting he was home when G.D. was burned. After being told by Mother that Father was not home when G.D. was burned, K.B. stated that it must have been Mother who woke her up. K.B. reported that she believes her sister knocked over the iron and was not deliberately burned. K.B. reported that Mother did not take G.B. to the hospital to treat her burns for financial reasons. She also stated that Father bought medical supplies at a pharmacy to treat G.D., presumably after he returned home.

The investigator contacted Father to inform him of the referral. When asked if G.D. had received medical treatment for her burns, he reported that she

5

had been taken to Newark Beth Israel Medical Center (Beth Israel).  Subsequent inquires revealed no record of G.D. having been treated at the hospital.

The investigator also interviewed Mother.  She said that she and G.D. were asleep in the same bed in the early morning hours of September 12, when Mother was awakened by a scream.  She said she saw G.D. standing near the bed with the iron cord wrapped around her arm.  Mother stated that the iron had been sitting on a nightstand and that she had left it turned on after using it earlier in the day.  Mother stated that the iron was new and did not have the automatic shut off feature of her old iron.  She speculated that G.D. had been sleeping on the floor, which she did when it was hot, got tangled in the iron's cord and accidentally pulled it down on her, causing the burns.  Mother said Father was not home when G.D. was burned because he was taking care of his sick father.

Mother also said she did not take G.D. to the hospital because she "had antiseptic at home."  She instead treated G.D.'s burns with Neosporin and gave her Tylenol.  Mother claimed that G.D. did not complain of pain in the days after she was burned.  After the interview, the investigator overheard Mother on the telephone ask Father, "why did you lie to the Division?  Don't you know they can find out whether she was taken to the hospital?  You don't do that."

At the investigator's urging, G.D. was taken to a burn center. Medical personnel determined G.D. suffered second- and third-degree burns on her chest, as well as burns on her neck, left side, and upper arms. A second-degree burn involves the epidermis, with the layer underneath being red, painful, and blistered. A third-degree burn involves the epidermis and lower layers of skin, including nerves, which results in an absence of pain. G.D.'s burns were not infected when she arrived at the hospital.[3]

G.D. was admitted to the step-down unit of the burn center. During her fifteen-day stay, G.D. received daily hydrotherapy, occlusive dressing changes, and split skin graft surgery with donor skin excised from her left buttock. G.D. would "loudly scream[] until [hydrotherapy] was completed," "scream[], push[] and kick[]" when scissors, water or removal tools were brought near her, and quietly cry while walking into the treatment room. Following surgery, G.D. had limited functional mobility and required physical and occupational therapy.

In a subsequent interview, Father repeated that he was not home when G.D. was burned. He said that he arrived at home at approximately 3:00 a.m.

---

[3] At trial, an expert explained that the classification of burns has changed to "superficial" for first-degree burns, "superficial partial thickness" for second-degree burns, "deep partial thickness" for third-degree burns. The classification for fourth-degree burns remains the same.

A-2823-20

and Mother told him G.D. had burned herself with the iron. He claimed to have "put a rag around the child's chest to soothe the pain from the burn." When told that G.D. had stated that he burned her with the iron, Father said the child probably meant to say that he treated her after she was burned accidentally.

During an interview with an agent from the prosecutor's office, G.D., who appears to have developmental delays, provided various accounts of how she sustained her injuries, but also repeatedly stated that "daddy" burned her. She said that Mother told Father "you can't burn her," and that Father responded, "I can and I can do it myself." G.D. recalled "screaming" and that "Mommy [was] crying for my body." Both Mother and Father were charged criminally in connection with G.D.'s burns and lack of medical care.

DCPP substantiated the allegations that Father physically abused G.D. and that both Mother and Father abused or neglected G.D. by not seeking medical care for her burns. The Division filed complaints in the Family Part seeking the care and supervision of G.D. and K.B., alleging defendants abused or neglected the children within the meaning of N.J.S.A. 9:6-8.21(c).

In addition to several fact witnesses, including G.D.'s teacher, the school nurse, and the prosecutor's office agent, the trial court heard testimony from three experts. In its oral opinion, the court found credible the opinion of Dr.

Weiner, a physician at Beth Israel, a regional diagnostic and treatment center for abused and neglected children, who the court qualified as an expert in child abuse pediatrics. The court found the expert "clearly and thoroughly articulated the basis of her conclusions."

The court accepted Dr. Weiner's opinion that "it was extremely unlikely that an iron accidentally fell on [G.D.] and caused these burns." Based on photographs of the injuries, the doctor opined that "the iron touched [G.D.] at least twice in two different orientations," causing "very well-defined marks" and lacking "motion artifact," which would leave "less defined . . . streaky or blotchy" markings "expect[ed] if [the iron] fell on her and she was struggling to get it off." The court found credible the expert's opinion that G.D. was "deliberately burned" with the iron "multiple times," noting that the photographs of the injuries show "clearly defined" steam holes from the bottom of the iron burned into G.D.'s skin, as well as delineations of the length of the iron and triangular shapes from its surface.

The court rejected the opinion offered by Father's expert in child abuse pediatrics that the burns were likely accidental. The court concluded that the expert was "unable to opine with a reasonable degree of medical certainty that the burns [G.D.] received were accidental."

9

While noting G.D. gave multiple versions of how she was burned, as well as some nonsensical answers to questions, the court concluded the expert's opinion, as well as the physical evidence, corroborated G.D.'s report that Father burned her with the iron multiple times. In addition, the court found Mother's false report to the school that G.D. was suffering from a viral infection and defendants' failure to seek medical treatment support the finding that the burns were deliberate. Thus, the court concluded, the Division had established by a preponderance of the evidence that Father deliberately burned G.D.

With respect to whether the delay in medical treatment subjected G.D. to harm or the risk of substantial harm, the court also accepted Dr. Weiner's opinion that G.D. would have been "screaming in pain" when she was burned and the second-degree burns would have "continued to cause [G.D.] pain" after the initial injury. The court also accepted the expert's opinion that a "reasonable parent seeing their child burned, seriously burned by an iron should seek medical care immediately" and that the delay in medical treatment put G.D. at risk of infection and "having the whole wound, the whole burn area not heal properly." The court found these potential medical consequences to be substantial risks of harm. In addition, the expert clinically diagnosed G.D. with "medical neglect," an opinion adopted by the trial court.

A-2823-20

The court rejected as "speculative" and "without support in the records" the opinion of Mother's expert physician in emergency room treatment that Mother's treatment of G.D.'s burns did not increase the child's risk of medical complications. The court noted that the expert offered that opinion despite his observation that "left untreated the third-degree burns would remain as open wounds" and that only a medical professional could determine whether a skin graft was necessary to treat a third-degree burn.

The court found that the medical treatment G.D. received during her two-week stay in the step-down burn unit was "drastically different" from the minimum care defendants provided, corroborating the conclusion that they failed to exercise a reasonable degree of care by not seeking medical treatment. The court acknowledged the absence of evidence that G.D.'s burns were infected. In addition, the court recognized the delay in treatment did not cause actual harm because G.D. was brought to the burn center at the Division's urging soon enough to obtain the treatment she would have obtained had she been promptly brought to the hospital by defendants.

In a February 18, 2021 order, the court found that Father abused or neglected G.D. by physically assaulting her and that Mother and Father abused

11

or neglected G.D. when they "failed to exercise a minimum degree of care in ensuring that [G.D.] received the medical attention in a timely fashion."[4]

These appeals followed. Father argues the trial court's finding that he deliberately burned G.D. is not supported by sufficient evidence. He argues that G.D. is an unreliable witness who offered confusing and conflicting accounts of how she was burned. He notes that during interviews G.D. did not know the difference between truth and lies and answered questions she did not understand. He contrasts her statements with his consistent denials of harming the child and Mother's consistent statements that he was not home when G.D. was burned and her admission that she left the iron on. He also notes the record contains no evidence as to why he would harm G.D. or that he took part in the decision not to take the child to the hospital, which, he contends, was made by Mother.

Mother argues the trial court erred because it relied on an ordinary negligence standard to conclude she abused or neglected G.D., measured her

---

[4] When G.D. was in the hospital, the Division effectuated an emergency removal of K.B. from defendants' custody pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82. See N.J. Div. of Youth & Fam. Servs. v. J.D., 417 N.J. Super. 1, 4 n.1 (App. Div. 2010). The Division later sought custody of G.D. Although the Division's applications were granted, the trial court ultimately returned custody of G.D. and K.B. to Mother and the protective services litigation was terminated on April 29, 2021. Father is restricted from residing in the family home because the criminal charges against him are unresolved. The briefs submitted to us address only the trial court's finding of abuse or neglect of G.D.

actions against a medical standard of care, and did not identify the subsection of N.J.S.A. 9:6-8.21(c) on which it relied for its conclusion. Mother argues that inclusion of the correct statutory standard in the court's order does not cure the deficiency in its oral opinion. Finally, Mother argues that the court ceded its decision-making authority to Dr. Weiner by adopting her opinion without referencing the relevant statutory standards.

G.D.'s law guardian filed a brief supporting the trial court's order. K.B.'s law guardian filed a brief supporting defendants' arguments.

II.

We defer to Family Part judges' fact-finding because of their "special jurisdiction and expertise in family matters," Cesare v. Cesare, 154 N.J. 394, 413 (1998), their "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand[,] [and their] feel of the case that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2006)). Fact-finding that is supported by "substantial credible evidence in the record" is upheld. N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 226 (2010). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been

made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)

(quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65,

69 (App. Div. 1989)). We review de novo the court's interpretation of the law.

D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

The "main focus" of Title Nine, of which N.J.S.A. 9:6-8.21(c) is a part, is

"the protection of children." Div. of Child Prot. & Permanency v. E.D.-O., 223

N.J. 166, 178 (2015) (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 177

(1999)). According to the relevant provisions of the statute, an "[a]bused or

neglected child" is a person

> less than [eighteen] years old whose parent or guardian
> . . . (1) inflicts or allows to be inflicted upon such child
> physical injury by other than accidental means which
> causes or creates a substantial risk of . . . serious or
> protracted disfigurement, or protracted impairment of
> physical or emotional health . . . (2) creates or allows
> to be created a substantial or ongoing risk of physical
> injury to such child by other than accidental means
> which would be likely to cause death or serious or
> protracted disfigurement . . . (4) or a child whose
> physical, mental, or emotional condition has been
> impaired or is in imminent danger of becoming
> impaired as the result of the failure of [a] parent . . . to
> exercise a minimum degree of care (a) in supplying the
> child with adequate . . . medical or surgical care though
> financially able to do so or though offered financial or
> other reasonable means to do so, or (b) in providing the
> child with proper supervision or guardianship, by
> unreasonably inflicting or allowing to be inflicted
> harm, or substantial risk thereof, including the

> infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c)(1), (2) and (4).]

Proof of harm under the statute can come from any number of competent sources, including "medical and hospital records, health care providers, caregivers, or qualified experts." N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 23 (2013). The trial court has the authority to weigh and evaluate expert's testimony. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 93 (App. Div. 2013). It is within the court's discretion to accept parts of a witness's testimony, while rejecting others. E&H Steel v. PSEG Fossil, LLC, 455 N.J. Super. 12, 29 (App. Div. 2018); Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002).

"The weight to be given to the evidence of experts is within the competence of the fact-finder." LaBracio Fam. P'ship v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001). A reviewing court should "defer to the trial court's assessment of expert evaluations." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221 (App. Div. 2013).

A child's hearsay statements are admissible to prove abuse or neglect when corroborated by other evidence. N.J.S.A. 9:6-8.46; N.J. Div. of Youth &

Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002). "[T]he most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission, or medical or scientific evidence." N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003).

We address first the trial court's conclusion that Father abused or neglected G.D. by deliberately inflicting a physical injury on her and causing a substantial risk of serious or protracted disfigurement or protracted impairment of her physical or emotional health within the meaning of N.J.S.A. 9:6-8.21(c)(1). We are not persuaded by Father's argument that the trial court's decision lacks sufficient evidentiary support in the record.

The court acknowledged that G.D. provided multiple accounts of how she was burned, some of which excluded Father. The court, however, did not rely only on G.D.'s hearsay statements to conclude Father deliberately burned her. Instead, the court found that the expert testimony of Dr. Weiner, who it determined to be credible, the photographs of G.D.'s burns, and defendants' dissembling with school personnel and failure to seek medical care, corroborated G.D.'s account of deliberate harm by Father. We have carefully reviewed the record, including the photographs of G.D.'s injuries, and are satisfied that there is sufficient support for the trial court's conclusion that it is

16

more likely than not that Father deliberately burned G.D. Furthermore, Father points to no precedent, and we are aware of none, requiring the Division prove a parent's motive for physically harming a child in order to establish abuse or neglect under N.J.S.A. 9:6-8.21(c). While the record does not contain evidence suggesting why Father would intentionally harm G.D., such evidence is not essential to a finding of abuse and neglect.

Nor do we find merit in defendants' arguments challenging the trial court's finding of abuse or neglect based on their failure to seek medical care for G.D. Under Section (c)(4), "a minimum degree of care" is "conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., 157 N.J. at 178. More is required than ordinary negligence, but less is needed than an intentional infliction of injury. Ibid. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." Id. at 179.

When considering Mother's argument that the trial court's oral decision was insufficiently precise in identifying the statutory basis on which the court relied, we begin with the well-settled principle that "appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001)). The February 18, 2021 order expressly states that defendants "failed to exercise a minimum degree of care in ensuring [G.D.] received . . . medical attention in a timely fashion." It is plain the court relied on N.J.S.A. 9:6-8.21(c)(4) when it determined defendants abused or neglected G.D. by failing to seek medical care. In addition, the court's oral opinion included a recitation of N.J.S.A. 9:6-8.21(c)(4), including the "minimum degree of care" standard, further evidencing the basis for the court's decision.

Our review of the record revealed ample support for the trial court's determination that G.D.'s physical, mental or emotional condition was impaired, in imminent danger of being impaired, or at substantial risk of harm because of defendants' failure to seek medical treatment for her serious burns. There can be little doubt that G.D.'s injuries, which required a fifteen-day hospital stay that included a surgical skin graft, needed medical attention beyond the application

of an antiseptic cream and a bandage. It is hard to imagine how any parent or guardian exercising even the most minimal level of care could allow a five-year-old child with third-degree burns to go unseen by a medical professional for four days. The fact that Father lied about having brought the child to a hospital, along with Mother's lie to school officials that G.D. had a viral infection to explain her absence from kindergarten, supports the trial court's conclusion that defendants knew G.D. had serious injuries but failed to secure medical treatment, likely to cover up deliberate abuse.

Fortunately for G.D., defendants' delay in seeking medical treatment did not worsen the outcome of her hospital stay and surgery. Actual harm to a child, however, is not necessary for a finding of abuse or neglect. A.L., 213 N.J. at 23. We have carefully considered defendants' remaining arguments and conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2823-20