# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0176-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.S.,

     Defendant-Appellant,

and

E.S., B.B., and S.H.,

     Defendants.

_____

IN THE MATTER OF B.S.,
R.H., A.S., and S.S., minors.

_____

Submitted May 10, 2021 – Decided July 21, 2021

Before Judges Messano and Hoffman.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0260-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Arthur David Malkin, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors A.S. and S.S. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Margo Hirsch, Designated Counsel, on the brief).

PER CURIAM

In this Title Nine case, defendant D.S. appeals from two orders. First, he appeals from an August 14, 2019 order finding that he abused or neglected a minor under his care, R.H. (Ronnie),[1] through the infliction of excessive corporal punishment. Second, defendant appeals from an August 3, 2020 order that terminated the litigation and required defendant's visits with his two biological children, A.S. (Aliyah) and S.S. (Sasha), remain therapeutically

---

[1] We use fictitious names in this opinion to maintain the confidentiality of the parties, as permitted by Rule 1:38-3(d)(12).

supervised until defendant completed services. Regarding the two orders, defendant presents the following points of argument for our consideration:

POINT ONE

THIS COURT SHOULD VACATE THE AUGUST 14, 2019 ORDER BECAUSE THE CONCLUSION THAT THE ALLEGATION OF ABUSE OR NEGLECT AG[A]INST D.S. WAS "ESTABLISHED" PURSUANT TO N.J.S.A. 9:6-8-21(c) IS NOT SUPPORTED BY ADMITTED EVIDENCE AND TESTIMONY WHICH DID NOT SHOW THAT ANY OF THE CHILDREN WERE HURT, OR SUFFERED SUBSTANTIAL INJURIES.

POINT TWO

THIS COURT SHOULD VACATE THE AUGUST 3, 2020 ORDER WHICH TERMINATED THE LITIGATION OVER D.S.'S OBJECTION AND LEFT THE RESTRICTIONS ON D.S.'S PARENTING TIME IN PLACE, BECAUSE D.S. WAS WILLING, BUT UNABLE, TO SET UP THE THERAPEUTIC VISITS THAT WERE RECOMMENDED.

The Law Guardian for Aliyah and Sasha joins with the Division of Child Protection and Permanency (Division) in opposing defendant's appeal. After reviewing the record, we conclude defendant's arguments lack merit; we therefore affirm.

A-0176-20

I.

We begin by summarizing the facts and procedural history relevant to this appeal. E.S. (Eve) is the mother of four children: a son, Ronnie (born in March 2004, and now seventeen years old), and three daughters, B.S. (Bianca) (born in June 2001, and now twenty years old), Aliyah (born in March 2010, and now eleven years old), and Sasha (born in May 2012, and now nine years old). Defendant was Eve's boyfriend and is the biological father of Aliyah and Sasha.[2]

In January 2019, Bianca called the police to report that defendant had beaten Aliyah and Sasha with a belt. Division "[i]nvestigators observed a light red lump/swollen bruise on [Sasha]'s leg and a light pink mark/bruise on [Aliyah]'s arm." Defendant admitted he "spanked the children on their arms and legs with a paddle after they were caught peeling and eating paint off of the walls in their bedroom." However, the Division deemed allegations of abuse related to this incident "not established" because the "light bruising" was "superficial" and because hospital discharge paperwork from an unrelated visit reflected there were no concerns.

---

[2] Ronnie's biological father, defendant S.H., and Bianca's biological father, defendant B.B., are not parties to this appeal.

4

On March 13, 2019, the Division received a referral from a relative of Ronnie, who alleged that two weeks earlier, defendant "choked [Ronnie] until he couldn't breathe." The relative learned of this incident when she met with Ronnie after Ronnie "called her and told her that he had a knife and if he didn't get out of the house, he was going to kill [defendant]."

Later that day, Division investigator April Gainer arrived at the home of Ronnie's maternal grandmother, where Ronnie went after calling the relative who contacted the Division. There, Gainer conducted interviews of Ronnie, and his older half-sister, Bianca. Over the following two days, March 14 and 15, 2019, Gainer interviewed Eve, Aliyah, Sasha, and defendant. During the interviews, Ronnie, Bianca, and Eve confirmed defendant had choked Ronnie two weeks prior. Defendant too admitted he had choked Ronnie, though he claimed the incident occurred "a few months prior after the child got in his face."

On March 20, 2019, citing concerns about ongoing abuse, the Division filed a verified complaint for care and supervision over all four children. Following a hearing on that date, the trial court entered an order placing the children "in the immediate care and supervision of the Division" and requiring the parents "show cause . . . why an order should not be entered continuing the child(ren) under the care and supervision of the Division . . . ." The court further

ordered that defendant "shall not have unsupervised contact with the children." At the return on the order to show cause hearing, held on April 8, 2019, the court continued these orders and further barred defendant from residing in or staying overnight in the same home as the children, required defendant provide the Division with his new address for a home inspection, and required defendant comply with the Division's recommended therapeutic and anger management services.

By June 2019, the Division concluded its investigation. The Division deemed "established" the allegation that defendant physically abused Ronnie by choking him. The trial court held a fact-finding hearing on August 14, 2019. The court heard testimony from Gainer, who testified about her March 2019 interviews with the family. No other testimony was presented.

Gainer described Ronnie's statements regarding the choking incident that occurred two weeks before the interview: "[Ronnie] said that the both of them were arguing and that [defendant] mushed him in the face. [Ronnie] mushed him back in the face. And then [defendant] responded by choking him with one hand until he felt faint, and then [defendant] let him go." Gainer noted that she did observe any marks or bruises on Ronnie, and that Ronnie did not seek medical attention and said he was not injured.

6

Ronnie had also informed Gainer that other arguments with defendant "on occasion . . . would become physical . . . and that [defendant] has punched him previously with a closed fist." Ronnie stated there was no physical altercation on the date of the referral, though he explained he "left the home to go to a relative's house, because he stated that he felt like if he stayed in the house and continued arguing with [defendant] that he was either was going to hurt himself or hurt [defendant]." Still, Ronnie told Gainer he was not scared of defendant "because he would always push [defendant] back . . . [i]f he pushed him . . . ." Gainer's investigation summary report, dated April 25, 2019, which the court received in evidence, also provided that Ronnie said he had not "witness[ed] any serious acts of physical abuse against [Aliyah] and [Sasha] in the home" though "[defendant] disciplines them by popping them on the hand or arm . . . ."

According to Gainer, Bianca said "she was not present during the alleged choking incident between [defendant] and [Ronnie], but stated that he had called her following that incident. She did note that she was present during the incident that had occurred in January between [defendant] and her two younger siblings, [Sasha] and [Aliyah]" where defendant "had disciplined them with a belt. He spanked them on their arms and their legs." The other two girls, Aliyah and Sasha, did not report any physical abuse in the home, though Aliyah "did note

7

the incident that had occurred in January and said that she had not been spanked since she got in trouble in January for eating the paint off the walls in the home." Gainer further testified that she did not see any visible signs of harm to any of the children when she met with them for the interviews.

Gainer testified that defendant admitted "he did indeed choke [Ronnie], because [Ronnie] was being disrespectful and got in his face. And that [Ronnie] needed to be put down, those were his . . . exact words." Gainer noted that Eve said "she does speak to [defendant] about not physically disciplining them in the home[,] [b]ut she's never home when any of the incidents occur" because she's at work.

Following Gainer's testimony, Ronnie's Law Guardian informed the court that Ronnie "did not wish for there to be a finding against [defendant] with regard to the allegations of the physical abuse, because he said it was in the past and that he feels safe with [defendant] at this time, and that he felt like [defendant] learned his lesson." The Law Guardian for Aliyah and Sasha stated, "I would submit and have the Division – to its proofs[,]" though she suggested "that this case would be better suited of a Title [Thirty]."

The trial court accepted and recited the facts established by Gainer's testimony. It found Gainer's "testimony was consistent with the . . . other

evidence presented. Her recollection was good. The [c]ourt found her to be credible." The court concluded defendant had committed abuse or neglect under Title Nine, explaining:

> Here [Ronnie] expressed that he was pushed, choked and punched by [defendant]. [Bianca] stated that [Ronnie] called her after the choking incident . . . and told her about it. [Bianca]'s statements . . . corroborate [Ronnie]'s statement. Most importantly however, [defendant] admitted to choking [Ronnie]. The children's accounts, particularly [Ronnie] -- [defendant] himself – corroborates [Ronnie]'s testimony. [Ronnie] acknowledged being the aggressor on occasion, that altercations often become physical. However the [c]ourt is very concerned with the fact that [defendant] felt it necessary to choke [Ronnie] until he felt faint. That in and of itself is of great concern to this [c]ourt. Understanding that children can get – out of control and there may be some – discipline that a parent can do, however that discipline should never rise to a level of choking a child until they feel faint. Therefore, the [c]ourt does determine by the preponderance of the evidence that the children are – that at least [Ronnie] was abused or neglected as defined by Title [Nine].

The court's accompanying order found defendant "abused or neglected the child(dren)" as defendant "was in a caretaker role and choked [Ronnie] until he became light[-]headed and for the reasons stated on the record."

After reaching this finding of abuse or neglect, the court transitioned into "a dispositional hearing." The Division requested the court continue to bar defendant from unsupervised contact and visits to the home because the children

9

disclosed that defendant was still staying overnight in the home, though he had not yet complied with the recommended and referred services. Defendant objected, his attorney arguing the family relied on defendant's supervision of the children as necessity to sustain and take care of the family. The Law Guardian for Aliyah and Sasha requested supervised visitation. Eve and the Law Guardian for Ronnie stated they had no objection to defendant spending overnights in the home.

As memorialized in its separate disposition order, dated August 14, 2019, the court ordered that defendant would only "be permitted to have supervised visitation, including overnight visits, on a self-executing basis, once he has engaged in anger management and that program has provided a collateral that he is consistently attending." At the conclusion of the dispositional hearing, the court explained:

> While I understand that [Ronnie]'s not there and . . . has no concerns, you know [defendant] took it a little too far. And . . . I think that . . . [Aliyah] and [Sasha] are probably in very different you know positions . . . than [Ronnie] is with their father, and understanding the relationship with – between [Ronnie] and [defendant] is not a biological one I suspect that the relationship is going to be very different. That having been said, I can not allow unsupervised. So, once he is engaged in that anger management – then the Division will get a collateral and supervised contact can commence.

Following the disposition, the Division referred defendant to an anger management program, thus entitling defendant to supervised visits with his daughters.[3]  However, after defendant missed three appointments, the anger management program closed out his case.  Following a compliance review hearing, the court ordered on November 12, 2019 that the Division re-refer defendant to a "program that can accommodate anger management, individual therapy and parenting classes."[4]

The Division received a new referral alleging defendant engaged in domestic violence against Eve on January 9, 2020.  According to the Division, when their investigator reported to the home, Eve "really opened up" to the Division and admitted there had been "a long history of domestic violence."  Eve described one incident where defendant had dragged her by her hair while she was supervising his visit to the home.  Another time, he used mace on her.  Most recently, just after Christmas 2019, defendant "ripped a TV off the wall" and threatened the family.

---

[3]  We assume the anger management program provided collateral to trigger the self-executing provision in the August 14, 2019 disposition order because the subsequent November 12, 2019 order states, "Visitation for [Sasha] and [Aliyah] with [defendant] shall remain same, specifically, [Eve] may supervise the visits . . . ."
[4]  The November 12, 2019 order also dismissed Bianca from the litigation following her Law Guardian's request during the hearing on that date.

During the next compliance review hearing on February 10, 2020, Eve's attorney stated Eve "did admit to the domestic violence. . . .  She did come to court to seek a temporary restraining order against [defendant].  She has no desire for [defendant] to come back to the home or continue a relationship with him.  She has severed ties with [defendant] at this point."  Additionally, the Law Guardian for Aliyah and Sasha informed the court that Aliyah and Sasha no longer want visits with defendant and "do not want him back in the home . . . ."  Following the hearing, the trial court entered an order on February 10, 2020, ordering defendant's visitation suspended because of the reported domestic violence and ordering him to comply with the Division's referred services.

In April 2020, defendant finally commenced the Division's recommended anger management, parenting, and individual therapy services.  Following the next compliance review hearing of May 4, 2020, the court ordered the Division to refer defendant for therapeutic visitation with Aliyah and Sasha, even though the Law Guardian for the two girls stated they were "adamant that they d[id] not want contact with him."[5]

---

[5] The court also ordered Ronnie be dismissed from the litigation, which his Law Guardian had requested during the May 4, 2020 hearing.

 A-0176-20

At the next hearing on June 29, 2010, the Division moved to terminate the litigation, but with the condition that the Division "provide visitation until [defendant] completes all services." The Law Guardian for Aliyah and Sasha stated, "the girls don't want to have visits with their father, so I'm not opposed to the dismissal with restraints. Certainly at a minimum, they would have to be therapeutic supervised [visits]." Defendant objected, his attorney arguing that "[h]e had been engaging in his services . . . to the extent that the pandemic has allowed and his schedule has allowed. He is really trying to go and finish those services." Regarding therapeutic visitation, defendant's attorney stated, "[T]he Division had referred him as of May 20th, but there haven't been any therapeutic visits actually occurring, despite him reaching out to intake" because the intake person was on vacation and there were not dates available when defendant reached out. Thus, defendant's attorney requested the court keep the case open "for one more cycle to ensure that my client could have his therapeutic visitation."

The court agreed to keep the case open for one more cycle, stating that it would have ordered dismissal if therapeutic visitation had commenced. The accompanying June 29, 2020 order provided defendant was to comply with the Division's services, including therapeutic visitation.

A July 17, 2020 document from the therapeutic visitation provider revealed defendant missed his intake appointment scheduled for July 1, 2020. Another record showed defendant missed a second intake appointment on July 31, 2020, and the provider indicated it was unable to reach defendant despite "multiple attempts to reschedule the intake."

The final hearing was held on August 3, 2020. The Division emphasized that the case had been kept open to give defendant the opportunity to begin therapeutic visitation, yet he failed to do. The Division further stressed its efforts to provide defendant with services but defendant declined to participate.[6] Thus, the Division again requested termination of the litigation with the restrictions on defendant's visitation unless he showed changed circumstances.

Defendant's attorney objected to the case's dismissal. He noted that he was unable to contact defendant this month and suggested that since defendant had been pushing for visitation for many months, he may not have had a working phone, which prevented him from scheduling the visitation. Additionally, defendant's attorney argued a dismissal of the case would result in an inappropriate "complete lack of parenting time" because defendant would not be

---

[6] Documents show that between April 16 and June 26, 2020, defendant attended six parenting sessions, but missed three. Between April 16 and July 14, 2020, defendant attended four anger management sessions and missed three.

able to afford therapeutic visitation on his own and instead requested supervised visits be allowed with defendant's uncle as a possible supervisor.

However, the Division argued defendant clearly had a phone, as a Division employee testified she last heard from defendant on July 24, 2020, when defendant told her he would reach out to the service provider to schedule therapeutic visitation. Responding to concern expressed by defendant's attorney that defendant would not be able to arrange therapeutic visitation himself, the Law Guardian for Aliyah and Sasha noted that defendant would have at least thirty days to request re-referral for therapeutic visitation from the Division following the case's dismissal.

The trial court dismissed the case, applying the restrictions on defendant's visitation requested by the Division. The court explained that defendant "has been less than compliant across the board since the inception of this case. And he has been in contact with the Division just a week ago. So, . . . he has a phone, and clearly he's been communicating with the Division, up until July 24th." In its corresponding order dated August 3, 2020, the court ordered:

> [Defendant] shall comply with anger management, individual therapy and parenting [services].
>
> . . . .

If [defendant] contacts the Division while the case is still open in the Division offices for visitation, the Division shall explore a new referral [for therapeutic visitation]. Otherwise, [defendant] shall make arrangements for therapeutic visitation should he desire visitation.

[ ] [Defendant]'s visitation shall continue to be supervised until he completes all Division services. [Defendant] may make an application to modify the visitation restrictions upon a showing of changed circumstances. Any applications to modify the visitation restrictions shall be made on notice to the Division.

Defendant now appeals this August 3, 2020 dismissal order, as well as the August 14, 2019 order which found he engaged in abuse or neglect as defined in Title Nine.

## II.

"In general, 'Title [Nine] controls the adjudication of abuse and neglect cases.'" Dep't of Children and Fams., Div. of Child Prot. and Permanency v. E.D.-O., 223 N.J. 166, 177 (2015) (quoting N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010)). Title Nine defines an "abused or neglected child" as one under the age of 18 whose

physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or

16

guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .

[N.J.S.A. 9:6-8.21(c)(4)(b).]

"Abuse and neglect cases are generally fact sensitive." N.J. Div. of Youth and Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011).  As our Supreme Court has recognized, cases adjudicating such claims by the Division require "careful, individual scrutiny." Ibid.

The quantum of proof required in a fact-finding hearing brought under Title Nine is well established.  The Division must prove its allegations by a preponderance of the evidence at a fact-finding hearing.  N.J.S.A. 9:6-8.46(b)(1).

In these matters, our standard of review is "strictly limited." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010).  We are bound to accept the trial court's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012).  "[A]ppellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" M.C. III, 201 N.J. at

342-43 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare v. Cesare, 154 N.J. 394, 413 (1998). We owe no deference, however, to the judge's legal conclusions. N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

Here, defendant argues the trial court's finding of abuse and neglect was not adequately supported by the record. He asserts the trial court made this finding based solely on the single incident where D.S. grabbed R.H. in the neck, which was insufficient to constitute "the infliction of excessive corporal punishment" amounting to abuse or neglect under N.J.S.A. 9:6-8.21(c)(4).

While the boundaries of what constitutes "excessive corporal punishment" are not defined by statute, we have placed particular weight on the statute's inclusion of the word "excessive" and have stated that "[t]he term 'excessive' means going beyond what is proper or reasonable." Dep't of Children and Fams., Div. of Child Prot. and Permanency v. K.A., 413 N.J. Super. 504, 511 (App. Div. 2010). "The general proposition is that a parent may inflict moderate correction such as is reasonable under the circumstances of a case[,]" and only punishment that is unreasonable or excessive constitutes abuse or neglect. Id.

at 510 (quoting State v. T.C., 347 N.J. Super. 219, 239-40 (App. Div. 2002)). In turn, excessive corporal punishment cases are fact-sensitive and "idiosyncratic." P.W.R., 205 N.J. at 33. We "ought not assume that what may be 'excessive' corporal punishment for a [] child must also constitute . . . excessive corporal punishment in another setting." Ibid.

When considering whether the punishment inflicted was excessive, courts "focus on the circumstances leading up to the injury and on the harm to the child, and not on the [parent or] guardian's intent." M.C. III, 201 N.J. at 344 (2010). We have stated that the reasons underlying the defendant's actions, the isolation of the incident, and the trying circumstances the defendant faced due to the child's conduct "form the prism through which we determine whether . . . actions [are] indeed 'excessive.'" K.A., 413 N.J. Super. at 512.

Defendant argues the circumstances here are similar to those in K.A. and for that reason, the record is insufficient to support the trial court's abuse and neglect finding. We disagree.

In K.A., we found that an isolated incident with a "psychologically disruptive child, unable or unwilling to follow verbal instructions or adhere to passive means of discipline" did not constitute abuse or neglect where the mother struck the child with a closed fist and caused four small bruises on the

19

child's shoulder.  Id. at 506, 512.  We determined that the "[b]ruises, although, visible, never exposed [the child] to any further harm if left untreated[,]" and the isolated incident was "not part of a pattern of punishment."  Id. at 512.  We also noted the mother "accepted full responsibility for her actions," and "[t]he Division did not at any time believe that removal of the child was necessary to protect her from further harm."  Id. at 512, 513.

Here, unlike in K.A., the evidence shows defendant's use of physical discipline was not isolated to this incident where he choked Ronnie. Significantly, Ronnie reported defendant had punched him on other occasions and described instances of defendant "popping" Aliyah and Sasha on the hands or arms.  Bianca similarly reported defendant used a belt to discipline Aliyah and Sasha.  Indeed, two or three months before receiving the referral about defendant choking Ronnie, the Division discovered defendant used a paddle or belt to discipline Aliyah and Sasha.

Additionally, we think the trial court assigned appropriate weight to the fact that defendant choked Ronnie until Ronnie became faint or light-headed. Though defendant's act apparently did not leave a bruise, it was forceful enough to risk R.H. losing consciousness or further injury requiring medical attention. The fortuitous circumstance that Ronnie did not sustain physical injuries that

20

could be observed or required medical intervention does not require a reversal of the court's abuse or neglect finding.  See, e.g., Dep't of Children & Fams., Div. of Youth & Fam. Servs. v. C.H., 414 N.J. Super. 472, 476 (App. Div. 2010) (affirming an abuse or neglect finding where the injuries did not require any medical attention).

Defendant's case is also unlike K.A. because there is no evidence defendant was confronted with a disruptive child who presented trying circumstances to defendant.  Ronnie "mushing" defendant's face after defendant first mushed Ronnie's face did not warrant a violent response from defendant. See N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 146-47 (App. Div. 2015) (finding abuse or neglect findings may be based in part on "the unreasonable and disproportionate parental response" to the child's action).  The circumstances leading up to defendant choking Ronnie clearly demonstrate defendant's response was disproportionate and unreasonable.

Finally, we note that the defendant in K.A. "accepted full responsibility for her actions, was contrite, and complied with Division-sponsored counseling[,]" and "[t]he Division did not at any time believe that removal of the child was necessary to protect her from further harm." K.A., 413 N.J. Super. at 512-13.  Here, defendant did not take responsibility for forcefully choking

21

Ronnie and struggled to comply with Division services. Additionally, the Division successfully sought restraints against defendant to separate him from the children in order to protect them from further abuse.

In sum, there is ample evidence distinguishing this case from K.A. and supporting the trial court's finding that defendant committed an act of abuse or neglect. Therefore, we perceive no reason to reverse the trial court's finding of abuse or neglect.

III.

Defendant also objects to the trial court's August 3, 2020 order terminating the litigation to the extent that it required his supervised visits be therapeutic; he does not object that visits be supervised. He contends it was inappropriate for the court to order such a restriction "without having heard sufficient evidence as to why those restrictions were necessary" and "without offering him the opportunity to cross-examine witnesses against him, and to present expert testimony in his behalf." He also argues the court lacked authority to limit his visitation rights as to Aliyah and Sasha when the Division "never sought a judicial finding indicating that [defendant] might put his children at risk of harm." These arguments lack merit.

A-0176-20

When a trial court makes a finding of abuse or neglect, it maintains jurisdiction in order to hold a dispositional hearing "to determine the appropriate outcome of the case." N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 399 (2009) (citing N.J.S.A. 9:6-8.50). At the dispositional hearing, which is often referred to as a "G.M. hearing,"[7] the court must determine whether the children "may safely be released to the custody of [the offending parent], who was responsible for [their] care at the time of the filing of the complaint, or whether, consistent with N.J.S.A. 9:6-8.51, some other disposition is appropriate." Id. at 402. Thus, the purpose of a G.M. hearing is to determine whether the parent has "abated the harm [he or she] previously posed" to the children. N.J. Div. of Youth and Fam. Servs. v. J.D., 417 N.J. Super. 1, 22 (App. Div. 2010).

The trial court may conduct the dispositional hearing immediately upon rendering an adjudication of abuse and neglect. N.J.S.A. 9:6-8.47; G.M., 198 N.J. at 399. The dispositional hearing must be conducted "with scrupulous adherence to procedural safeguards," and the trial court's conclusions must be

---

[7] The dispositional hearing began to be called a "G.M. hearing" after the Supreme Court discussed the critical importance of this hearing in Title 9 proceedings in G.M., 198 N.J. at 387-88.

based on material and relevant evidence. <u>N.J. Div. of Youth & Fam. Servs. v.</u> <u>A.R.G.</u>, 179 N.J. 264, 286 (2004).

Following a dispositional hearing, the trial court may:

> [E]nter a suspended judgment, N.J.S.A. 9:6-8.52; release the child to the custody of the parent or guardian responsible for the child's care at the time of the filing of the complaint, N.J.S.A. 9:6-8.53; place the child with "a relative or other suitable person," N.J.S.A. 9:6-8.54(a); make an order of protection, N.J.S.A. 9:6-8.55; place the offending parent or guardian on probation, N.J.S.A. 9:6-8.56; and/or require the offending person to accept therapeutic services. N.J.S.A. 9:6-8.51(a).
>
> [<u>G.M.</u>, 198 N.J. at 399-400.]

An order of protection entered under N.J.S.A. 9:6-8.55 may require a parent or guardian "[t]o stay away from the home, the other spouse or the child" and "[t]o permit a parent to visit the child at stated periods . . . ." N.J.S.A. 9:6-8.55(a), (b).

Thereafter, if the offending parent believes that the custodial arrangement ordered by the trial court following the <u>G.M.</u> hearing is no longer appropriate, he or she may file a motion to change custody alleging sufficient changed circumstances under either a dissolution (FM) docket or a non-dissolution (FD) docket. <u>N.J. Div. of Youth & Fam. Servs. v. W.F.</u>, 434 N.J. Super. 288, 300 (App. Div. 2014). Additionally, N.J.S.A. 9:6-8.59 permits a "court on its own

24

motion" "[f]or good cause shown and after due notice," to "modify or vacate any order issued in the course of a proceeding under [Title Nine]."

We find nothing here improper or inappropriate about the trial court's order limiting defendant to therapeutic visitation. We note that the court's August 3, 2020 order terminating the litigation with this restriction in place operated implicitly as a second disposition. See J.D., 417 N.J. Super. at 20 ("As a matter of practice, several dispositional hearings may be held until the Title 9 litigation is concluded."); see also N.J.S.A. 9:6-8.70 ("An appeal may be taken as a matter of right from any final order of disposition . . . ."). The court entered this disposition against defendant because it determined he had not abated the harm he posed to Aliyah and Sasha.

Before the court issued this order, defendant had ample opportunity to present evidence as to why the visitation restriction was inappropriate and any other supporting evidence. Indeed, the Division warned defendant at the May 4, 2020 compliance review hearing that it would be requesting dismissal with the restrictions on his visitation unless he substantially complied with services. The court then held two more hearings before it terminated the litigation. Defendant objected to this potential disposition, yet he failed to present evidence or call witnesses in support of his objection. Thus, defendant was afforded

25

sufficient due process before this final disposition was entered against him. In turn, as part of the disposition, the court permissibly required defendant to accept therapeutic services, stay away from his children and their home, and only visit his children under stated conditions.

Moreover, even if the August 3, 2020 order technically was not a separate disposition, the court was empowered under N.J.S.A. 9:6-8.59 to modify its prior disposition order with upon a showing of good cause with proper notice. Defendant engaging in domestic violence in front of his children after the original August 14, 2019 disposition order constituted good cause to amend the disposition order to require defendant's visits not just be supervised, but also therapeutic. As noted, defendant had sufficient notice of this restriction before the court's August 3, 2020 hearing and order.

The trial court found, based on competent proofs in the record, that defendant abused or neglected a child under his care. This finding brought the other children under defendant's care into the purview of the court's disposition against defendant, as the court was entitled to conclude that not only Ronnie was endangered by being in defendant's care but the other children as well. We have previously said, "[p]redictions as to probable future conduct can only be based upon past performance," J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978),

26

and the physical abuse of one child can be "a dangerous harbinger to one or more of the others," N.J. Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002). The court could permissibly infer from defendant's excessive discipline of Ronnie as well as his past discipline of the Aliyah and Sasha that their health and well-being were and would continue to be jeopardized if left in defendant's care. See also N.J.S.A. 9:6-8.46(a)(1) (declaring that "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the responsibility of, the parent or guardian").

Under Title Nine, children's safety is the paramount concern. N.J.S.A. 9:6-8.8(a). There is adequate evidence in the record here showing the restrictions on defendant's visitation are necessary to protect the safety of Aliyah and Sasha, including defendant's past violence towards his family and his lack of engagement in services. We therefore discern no basis to disturb the trial court's findings and orders.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-0176-20